### The UNITED STATES

v.

Dean K. FELTON, Nancy E. Bruce, John Zorak a/k/a Johnny, Anthony Serrao a/k/a Buddy, Richard Cox a/k/a Ricky, James Thurman, John Hathorne.

#### Appeal of John HATHORN.

No. 84–3270.

United States Court of Appeals, Third Circuit.

Argued Dec. 17, 1984.

Decided Jan. 16, 1985.

Robert C. Eddins (argued), Pittsburgh, Pa., for appellant John Hathorn.

J. Alan Johnson, U.S. Atty., Paul J. Brysh (argued), Constance M. Bowden, Asst. U.S. Attys., Pittsburgh, Pa., for appellee.

Before ALDISERT, Chief Judge, BECKER, Circuit Judge, and STERN, District Judge.*

## OPINION OF THE COURT

ALDISERT, Chief Judge.

The question for decision is whether appellant would be placed in double jeopardy in violation of the fifth amendment were he to be prosecuted in the Western District of Pennsylvania on a charge of conspiracy to distribute and possess marijuana following a plea of guilty and subsequent sentence in the Northern District of Florida on a similar charge. Appellant argues that the Florida and Pennsylvania activities were part of the same conspiracy; the government argues otherwise. The district court agreed with the government and denied appellant's double jeopardy motion to dismiss the indictment. 592 F.Supp. 172. This appeal followed. Although the question is close, we are persuaded that the government failed to meet its burden of proving the existence of two distinct conspiracies.

### I.

John Hathorn[1] pleaded guilty in the Northern District of Florida in 1982 to a charge of conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 841. In the Western Pennsylvania indictment he is charged with conspiracy to distribute and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1).

---

* Honorable Herbert J. Stern, of the United States District Court for the District of New Jersey, sitting by designation.

1. Although certain government papers refer to him as "Hathorne," we will use the spelling used by the appellant in his signature and instructions to the court reporter.

■ Legal precepts that control our evaluation of the facts are familiar. Jeopardy attached in the Florida prosecution with acceptance of the guilty plea. *United States v. Jerry,* 487 F.2d 600, 606 (3d Cir. 1973). To support a claim of double jeopardy, it must be shown that the two offenses charged are in law and in fact the same offense. *United States v. Ewell,* 383 U.S. 116, 124, 86 S.Ct. 773, 778, 15 L.Ed.2d 627 (1966). "Offenses are not the same merely because they arise out of the same general course of criminal conduct, 'they are the same only when the evidence required to support a conviction upon one of [the indictments] would have been sufficient to warrant a conviction upon the other.'" *United States v. Young,* 503 F.2d 1072, 1075 (3d Cir.1974) (citations omitted). "[A] single conspiracy may not be subdivided arbitrarily for the purposes of prosecution." *Id.* at 1075. *See also United States v. Inmon,* 568 F.2d 326 (3d Cir.1977). Although the defendant has the burden of going forward with the evidence by putting his double jeopardy claim in issue, once he has made a non-frivolous showing, the burden of persuasion shifts to the government. *Id.* at 330. Where, as here, the issue is whether there was one or two conspiracies, the government must then prove by a preponderance of the evidence that there were separate conspiracies. *Id.* at 331–32.

We are satisfied that the district court recognized these precepts in its consideration of the motion to dismiss the indictment. The district court held that Hathorn presented a non-frivolous claim. We agree. Our inquiry thus follows a narrow compass. We now must decide whether the government met its burden of proving by a preponderance of the evidence that there were two separate conspiracies.

■ To decide this controlling question we must evaluate the government's case and decide if a sufficient quantity of evidence was presented to meet the legal standard governing the burden. *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir.1969). The government suggests a different review standard, urging us to adopt the clearly erroneous test because the question whether the conspiracy in this case is the same as the Florida conspiracy is one of fact. As authority for this novel proposition, it relies upon *United States v. Lurz,* 666 F.2d 69, 74 (4th Cir.1981), *cert. denied,* 459 U.S. 843, 103 S.Ct. 95, 74 L.Ed.2d 87 (1982). But the government reads into a single sentence from *Lurz* a sweep not reasonably embraced in its terms. All that the Court said there was: "However, the issue is factual and, where facts are different, so may the conclusion differ." *Id.* We find it necessary to reiterate that on review the trial court's findings of narrative or historical facts are measured by the clearly erroneous test, but as to the legal component of its conclusion, this court has plenary review. *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 103 (3d Cir.1981). Accordingly, what we must examine here is whether the district court correctly determined that as a matter of law the government met its burden of proving the separate conspiracies by a preponderance of the evidence. Such an inquiry requires us to examine the basic facts of record and the permissible inferences that may be drawn therefrom.

## II.

■ Turning now to the facts, we conclude that the government has not proved by a preponderance of the evidence that Hathorn was involved in two separate conspiracies. Initially, we note an overlap in the time periods covered by the indictments. The Western Pennsylvania indictment covers a period from "the beginning of 1979 through, on, or about May 13, 1981, in the Western District of Pennsylvania and elsewhere." App. at 2a. The time period in the Florida indictment is included within the time frame above, and runs "from on or about December 1, 1980, until on or about March 24, 1981, in the Northern District of Florida and elsewhere." *Id.* at 3a.

Next, we must examine the specific activities alleged in the indictments. The Florida indictment charged Hathorn and several

co-conspirators with a conspiracy "to possess with intent to distribute ... more than 1,000 pounds of marijuana." The Western Pennsylvania indictment charged Hathorn and another group of co-conspirators with a similar conspiracy and described Hathorn's specific activity as follows:

### Overt Act # 9

In or about mid-September of 1980, in the area of Suwanee, Georgia, DEAN K. FELTON purchased approximately 650 pounds of marijuana from JOHN HATHORNE and other persons known to the grand jury. The defendant, DEAN K. FELTON, tendered a partial payment which consisted of approximately 80 gold krugerands and $30,000 in currency for the aforementioned marihuana.

*Id.* at 2a–3.

### Overt Act # 12

In or about late October, 1980, DEAN K. FELTON purchased approximately 1200 pounds of marijuana from JAMES THURMAN, JOHN HATHORNE and persons known to the grand jury in the Atlanta, Georgia area.

*Id.* at 2a–4.[2]

After reviewing the transcripts of the double jeopardy hearing held in Pittsburgh, and the previous trial in Florida, we are faced with very compelling inferences linking the two supposedly separate conspiracies.

Although the Florida indictment only covered the period from December 1, 1980 to March 24, 1981, the available testimony showed that Hathorn and his co-conspirators, Paul Rice, Gerald Sabo, Thomas Black, Tommy Baxley, Ben Masters, Eddie Black, and others, operated a smuggling operation out of Atlanta that existed before and after these dates. This group made at least four smuggling flights to Colombia during this period, in September and December of 1980, and March and June of 1981.

These flights had many elements in common from which one could infer a continuing, albeit loosely organized, conspiracy, as set forth in detail in the appendix to this opinion. First, the people involved, and their specific roles, were relatively common to all of the flights. John Hathorn piloted or helped pilot the plane in all the trips. Eddie Black helped pilot the March flight, Fla.T.Tr. at 31,[3] and was ground crew on the others. T.Tr. at 71, 99, 109. Ben Masters provided the aircraft for the September and December trips. T.Tr. at 63, 98. He, along with John Rose and Gerald Sabo, also helped finance the aircraft for the March flight. Fla.T.Tr. at 96. Jim Thurmon arranged the pick up of the drugs in South America on the first flight, T.Tr. at 96, and John Hathorn made these arrangements afterwards, probably using the same contact in South America. T.Tr. at 73, Fla.T.Tr. at 43. Gerald Sabo, Thomas Black and Tommy Baxley were on the

---

**2.** The government attempts to minimize the allegation of Overt Act # 12. At trial the assistant U.S. attorney explained:

> Your Honor, I am going to object at this point. The only overt act that involves this particular defendant is overt act 9 and the ones that have been identified as corresponding to overt act 9. Agent Carroll has testified that the defendant Hathorne was not involved in overt acts 11, 12, 13 or 14. To continue to go on through all the other overt acts of the indictment which refer to activity that occurred in Western Pennsylvania doesn't seem to be relevant to the double jeopardy issue here.

T.Tr. at 110. We strongly disagree with the government here. In the context of this appeal, what is critical are the indictments, not the government's proposed strategy at a subsequent

trial. What controls is what the two grand juries did, not what the government proposed to do with their indictments thereafter. What was before the grand jury in Florida and Pennsylvania is not only relevant to the double jeopardy issue but it is critical as to whether the two grand juries were referring to the same or separate conspiracies. Thus, alleged Overt Act # 12 must be considered in the context of the double jeopardy evaluation.

**3.** Unfortunately, counsel for the parties failed to observe our rules and neglected to paginate properly all the pages in the appendix. Accordingly we are forced to refer to transcript pages of several court procedures. The transcript of the double jeopardy hearing below will be referred to as "T.Tr.", the transcript of the prior trial in Florida will be referred to as "Fla.T.Tr."

ground crew for the returning flights. T.Tr. at 71, 99, 109, Fla.T.Tr. at 26, 31. In addition to this continuity in personnel, the flights were also logistically similar. The flights usually originated in the Atlanta area. Fla.T.Tr. at 16, 30, 41. All flights picked up marijuana in Colombia, South America, and returned. T.Tr. at 99, Fla. T.Tr. at 16, 36, 41. The return destinations of these flights were also similar, with the September, December,[4] and June flights destined for Blakely, Georgia. T.Tr. at 78, 99, Fla.T.Tr. at 41. Given all these personnel and operational similarities, one might logically infer a continuing conspiracy to smuggle marijuana by the group which operated out of Atlanta, and that the subsequent distribution of this marijuana was also out of the Atlanta area.

The government seeks to distinguish the September flight from the later flights involved in the Florida indictment through testimony that Jim Thurman dropped out of the conspiracy after the September flight because of a money dispute. T.Tr. at 96. However, given the continuing nature of both the operations and personnel of the group, Thurman's departure was apparently insignificant.

The testimony also linked the Atlanta group with the marijuana subject to the Western Pennsylvania indictment. At the Pittsburgh hearing, DEA Special Agent Larry J. Carroll identified the September flight of this group as the source of the 650 pounds of marijuana sold to Dean Felton in September, which event is listed as Overt Act # 9 in the Western Pennsylvania indictment. T.Tr. at 98. He testified that Sabo, "the middle man," had previously arranged this sale by phone with Dean Felton, T.Tr. at 106, and that Baxley, Masters, Black, and Hathorn were also involved in Overt Act # 9. Significantly, Hathorn also testified about this September shipment at the Florida trial. He testified that he and Eddie Black took 100 pounds of marijuana to John Rose's residence "about six months

previous to March of 81 or eight months previous." Fla.T.Tr. at 25. This was corroborated by Black and Rose. It is therefore reasonable to conclude that the load of marijuana discussed in the Florida trial was the same originating load as that covered by the Western Pennsylvania indictment. In any event, the government did not meet its burden of proving otherwise.

Agent Carroll also testified that Eddie Black, Sabo and Baxley were involved in the October sale of 1,200 lbs. of marijuana to Dean Felton, specified as Overt Act # 12 in the Western Pennsylvania indictment. T.Tr. at 109. Although no one testified as to the source of this marijuana, one could infer that the group had made another successful flight to Colombia sometime in October. The December and March flights, which were included in the time frame of the Florida indictment, were intercepted by police at Tallahassee and Gainesville and consequently no sales were made. However, given the continuity of the operation, portions of these loads could also have been destined for Pittsburgh through the Felton-Sabo connection.

Another tie between these flights and the sales listed in the Western Pennsylvania indictment is that both sales to Felton specified in that indictment took place in the Atlanta area, where this group was apparently based. Finally, although the DEA agent in charge of the Florida investigation testified as to the distinct nature of the conspiracies involved in the two indictments, he admitted on cross-examination that he was aware of other smuggling trips to South America by members of the group prior to the trips covered by the Florida indictment. T.Tr. at 82.

Thus we are faced with some very impressive permissible, if not compelling, inferences that indicate Hathorn's involvement in only one conspiracy. First, there is evidence of participation by many of the same conspirators in both indictments. Second, there is persuasive evidence that

4. The December flight did not arrive at Blakely, due to an accident in Tallahassee. T.Tr. at 71. Paul Rice, the pilot, taxied the plane into a

parked aircraft. He and John Hathorn abandoned the aircraft, which authorities then seized. T.Tr. at 61.

the marijuana in the Western Pennsylvania indictment originated at the same source as that in the Florida indictment. A fact finder could conclude that the 650 pounds of marijuana for which Hathorn was charged in Overt Act # 9 was part of a load smuggled from Colombia, South America, in September 1980 and transported to Atlanta, Georgia. A fact finder might also conclude that the connection to Western Pennsylvania was not simply a one time transaction, but had a more permanent nature.

To be sure, the issue is not free from doubt. But to be equally sure, the government had the burden of proving the separate conspiracies by a preponderance of the evidence, or to demonstrate that it was more likely than not that there was more than one conspiracy. *United States v. Inmon,* 568 F.2d 326, 331–32 (3d Cir.1977). In addition to relying on federal agent testimony in the court below, the government had access to the grand jury proceedings that led to the Florida indictment. At oral argument it was conceded that no recourse to those minutes was attempted. Having elected to put in a thin case to prove separate conspiracies, the government bore the risk of failing to meet its burden.

Under these circumstances it is not incumbent upon us to devote extensive treatment of the "same evidence" test, *see United States v. Mallah,* 503 F.2d 971 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975), or the "totality of the circumstances" approach, *see United States v. Tercero,* 580 F.2d 312 (8th Cir. 1978). Under each, the result would be the same.

We reach this conclusion with full knowledge that there may have been a break in the continuity of appellant's marijuana activity in the fall of 1980, that Hathorn and James Thurman did not work together after September 1980 because of a dispute about money, that in subsequent activities there were personnel changes in the marijuana scheme, and that there was a passage of some three months between the September and December activities. But this was insufficient to offset Hathorn's testimony and its corroboration concerning the common source of the marijuana, the express language of the two indictments and overt acts alleged therein, the overlap of time alleged in the indictment, and the considerable overlap of personnel in the September 1980 and subsequent activities.

The judgment of the district court will be reversed and the proceedings remanded with a direction to dismiss the indictment against John Hathorn on the basis of double jeopardy.

## APPENDIX