

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-6-1996

# USA v. Smith

Precedential or Non-Precedential:

Docket 95-5257

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"USA v. Smith" (1996). *1996 Decisions.* Paper 170.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/170

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 95-5257


UNITED STATES OF AMERICA

v.

J. DAVID SMITH

David Smith,
Appellant


On Appeal From the United States District Court
For the District of New Jersey
(D.C. Crim. Action No. 94-cr-00524-1)


Argued October 26, 1995

BEFORE:  STAPLETON, McKEE and GIBSON,* Circuit Judges

(Opinion Filed   May 6, l996)

                    Faith S. Hochberg
                    United States Attorney
                    Kevin McNulty
                    Kimberly M. Guagdagno (Argued)
                    Patrick L. Rocco
                    Assistant U.S. Attorneys
                    970 Broad Street - Room 502
                    Newark, NJ 07102

                         Attorneys for Appellee

                    Dominic F. Amorosa (Argued)
                    233 Broadway, Suite 3008
                    New York, NY 10279

                         Attorney for Appellant

* Honorable John R. Gibson, United States Circuit Judge for the
  Eighth Circuit, sitting by designation.

OPINION OF THE COURT

STAPLETON, Circuit Judge:

J. David Smith contends that multiple conspiracy indictments have put him twice in jeopardy for the same offense. The defendant was indicted in New Jersey for conspiring to defraud GTECH, his employer, through a kickback scheme. On the same day, he was indicted in Kentucky for conspiring to defraud GTECH with a different co-conspirator, also through a kickback scheme. After he was acquitted of the Kentucky charges, Smith filed a pretrial motion in the New Jersey prosecution to dismiss the conspiracy charges on double jeopardy grounds and both the conspiracy and substantive charges on collateral estoppel grounds. The court denied his motion, finding that he had failed to make the required showing under United States v. Liotard, 817 F.2d 1074 (3d Cir. 1987), and that the issues raised in the New Jersey indictment were not identical to those decided in the Kentucky trial.
We will affirm.

I.

All charges against J. David Smith stem from his employment with GTECH, a lottery service company located in Rhode Island. Smith was the national sales manager for GTECH until

3

December 1993, with offices at the Rhode Island headquarters.  He also maintained a farm and residence in Kentucky.  During the time periods covered by the indictments, GTECH provided services to the state lotteries of New Jersey and Kentucky, as well as other states.

Steven D'Andrea and Joseph LaPorta are New Jersey residents who owned and controlled three New Jersey consulting companies, Benchmark Enterprises, Inc. ("Benchmark"), Sambuca Consultants ("Sambuca"), and Production Group Incorporated ("PGI").  Luther Roger Wells, Jr., was a Kentucky resident who owned Bluegrass Industrial ("Bluegrass") and Bluegrass Industrial Distributors ("BID").  BID ostensibly provided ribbons used to print lottery tickets.  Karen Smith, the defendant's wife, lived in Kentucky with her husband.  She owned International Marketing Concepts, Inc. ("IMC").

The Federal Bureau of Investigations ("FBI") began investigating D'Andrea in June of 1993.  Investigators had Benchmark corporate records, GTECH records, and Smith's Kentucky bank records subpoenaed.  By April 11, 1994, the investigation had produced information that prompted the New Jersey Division of the United States Attorney's Office to send Smith a target letter.  Smith was thereafter advised that the FBI's evidence indicated that he was involved in a kickback scheme to defraud GTECH.  Smith allegedly would arrange for service providers in New Jersey, New York, Texas, and Kentucky to be engaged by GTECH

2

and to be paid for non-existent or over-valued services.[1]  These service providers included Benchmark, Sambuca, and PGI in New Jersey, and BID in Kentucky.  In return, these service providers would send kickbacks to third parties in Kentucky designated by Smith.  These third parties included IMC and Billy Adams, a carpenter who frequently did work on Smith's farm.  When IMC, Adams, and the three other designated third parties received the "consulting fees" from the service providers in the various states, they would transmit the funds to Smith and his wife or apply them for their benefit.  According to an affidavit of Smith's counsel, the United States Attorney sought Smith's cooperation and threatened him with indictments in all four states if he failed to cooperate.  Smith declined to cooperate and indictments against him were simultaneously returned in Kentucky and New Jersey.

The federal grand jury in Kentucky returned a ten count indictment charging Wells and Smith with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371, aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 & 1346, money laundering in violation of 18 U.S.C. § 1956, and assisting in the preparation of a false corporate tax return in violation of 26 U.S.C. § 7206(2).  The fraud counts charged Smith and Wells of defrauding GTECH of money and Smith's "honest services."  See

---

[1]  Although the investigations uncovered activities in Texas and New York, Smith limits his double jeopardy arguments to the activities alleged in Kentucky and New Jersey.

3

Indictment in <u>United States v. Smith</u>, ¶¶ 6, 19 (W.D. Ky., September 29, 1994).

Allegedly, Smith authorized BID to receive 8% brokerage commissions on paper sales from RMF Business Forms, Inc., a New York corporation, to GTECH and the Kentucky Lottery Corporation. Wells set up BID for the sole purpose of receiving the brokerage payments. Neither Wells nor BID provided services of any kind to GTECH or the Kentucky Lottery Corporation. Smith had GTECH employees in Kentucky fill out false invoices from Wells requesting his 8% commission, which were then processed in Rhode Island.

When Wells received his payments, he sent a portion to IMC, Adams, and other designated third parties. The payments were disguised as "consulting fees." The alleged conspiracy lasted from April 1992 to February 1994, and a total of $31,000 was purportedly kicked back to Smith and his wife during this period.

The Kentucky prosecution went to trial. After the prosecution presented its case, the judge entered a judgment of acquittal on all the charges pursuant to Fed. R. Crim. P. 29. He found that (i) the record contained insufficient evidence indicating that GTECH lost any money; (ii) a violation of GTECH's intangible right to Smith's honest services could not support a criminal fraud conviction; and (iii) the government failed to prove that GTECH was unaware of the kickback payments and that the payments were unauthorized. The judge found that the facts

4

indicated that GTECH had willingly paid BID fees for the purpose of generating goodwill, and no fraud had occurred.

The New Jersey federal grand jury returned a nineteen count indictment charging Smith, D'Andrea, and LaPorta with conspiring unlawfully to transport money obtained by fraud in violation of 18 U.S.C. § 371, transporting such money in violation of 18 U.S.C. § 2314, violating the New Jersey commercial bribery statute in violation of 18 U.S.C. § 1952, and laundering the proceeds of their fraud in violation of 18 U.S.C. § 1956. See Indictment in United States v. Smith (D.N.J., September 29, 1994).

Allegedly, Smith met with D'Andrea and LaPorta in April 1992. LaPorta agreed to introduce GTECH employees to representatives of the State of New Jersey to discuss implementing a new lottery game called "Keno." Smith recommended to officers of GTECH that GTECH employ Benchmark as a consultant in New Jersey. He eventually had $579,047 in consulting fees paid to Benchmark, and in return, D'Andrea and LaPorta gave Smith $157,000 in kickbacks. Over the course of the alleged conspiracy, Smith also directed GTECH to pay consulting fees to PGI and Sambuca. As in the Kentucky scheme, the consultants sent the payments to IMC, Adams, and other third parties in Kentucky designated by Smith, who then applied the balance for the benefit of Smith and his wife. The conspiracy allegedly lasted from March 1992 to March 1994.

5

The trial in the New Jersey case was scheduled to proceed in April 1995. In pretrial motions, Smith raised double jeopardy and collateral estoppel as defenses to all the New Jersey counts. Applying the analysis set forth in Liotard, the court found, without an evidentiary hearing, that the conspiracy charge was not barred because Smith had failed to make the required non-frivolous showing that there had been only one conspiracy. Issue preclusion was found to be inapposite since none of the issues decided in Kentucky were presented by the New Jersey indictment. Smith appeals the court's ruling on the conspiracy charge and denial of collateral estoppel on all the charges. He does not appeal the ruling that the substantive charges are not barred by double jeopardy.

II.

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. Pretrial orders denying motions to dismiss an indictment on double jeopardy grounds are within the "collateral order" exception to the final order requirement. See United States v. Esposito, 912 F.2d 60, 61 (3d Cir. 1990), cert. dismissed, 498 U.S. 1075 (1991). Consequently, we have appellate jurisdiction to consider Smith's appeal under 28 U.S.C. § 1291. Our review of double jeopardy challenges is plenary. See United States v. Ciancaglini, 858 F.2d 923, 926 (3d Cir. 1988). Since collateral estoppel as a bar to reprosecution is a component of the Double Jeopardy Clause, see Ashe v. Swenson, 397 U.S. 436,

6

445-46 (1970), and is an issue of law, see Swineford v. Snyder County, 15 F.3d 1258, 1265 (3d Cir. 1994), our review of the collateral estoppel claims is also plenary.

III.

The Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Supreme Court has emphasized the importance of protecting individuals not only from double punishment, but also from being twice subject to trial:

> [T]he guarantee against double jeopardy assures an individual that, among other things, he will not be forced, with certain exceptions, to endure the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense. It thus protects interests wholly unrelated to the propriety of any subsequent conviction. . . . [E]ven if the accused is acquitted, . . . he has still been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit. Consequently, if a criminal defendant is to avoid *exposure* to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge to the indictment must be reviewable before that subsequent exposure occurs.

Abney v. United States, 431 U.S. 651, 661-62 (1977).

Following Abney, we established in United States v. Inmon, 568 F.2d 326 (3d Cir. 1977), the procedure by which a defendant could vindicate his double jeopardy rights prior to trial. We held that "when a defendant has made a non-frivolous showing that a second indictment is for the same offense for which he was formerly in jeopardy, the government must prove by a preponderance of the evidence that there were in fact separate

7

offenses before the defendant may be subjected to trial."  Id. at 332.  In allocating the burden of proof, the paramount consideration was the "impracticality of placing the evidentiary burden on" the defendant:

> Inmon would be required to prove facts establishing the charge of conspiracy to which he pleaded guilty and to prove facts establishing the second conspiracy as well. How he could do either, without access to the proof on which the government proposed to rely and without the ability to offer immunity to prospective witnesses, is not readily apparent.  Even after a trial on the first indictment, the defendant would lack access to the government's proof of the second offense.

Id. at 329-30.

We have been keenly aware of the difficulty of vindicating double jeopardy rights prior to trial.  We have stressed that the possibility of making a non-frivolous showing must be within the reach of a defendant innocent of the charges and without knowledge of the evidence the government may put forth.  Were the threshold showing made any higher, a conspiracy defendant would be without a meaningful opportunity to protect his right to avoid exposure to a second trial for the same crime. These considerations define an important difference between an assessment of double jeopardy rights prior to an evidentiary hearing and after a hearing or full trial when we have the benefit of a developed record.  Compare, e.g., Ciancaglini, 858 F.2d at 926-30; Liotard, 817 F.2d at 1077-79; and Inmon, 568 F.2d at 329-33 with, e.g., United States v. Becker, 892 F.2d 265 (3d Cir. 1989); United States v. Felton, 753 F.2d 276 (3d Cir. 1985); and United States v. Inmon, 594 F.2d 352 (3d Cir.) (affirming

8

denial of double jeopardy claim after evidentiary hearing), <u>cert. denied</u>, 444 U.S. 859 (1979).

Although the "same evidence" test is normally used to ascertain whether successive prosecutions charge the same crime, in <u>Liotard</u> we recognized that multiple conspiracy indictments raised special concerns that the "same evidence test" might not adequately address.[2]  "The danger is that successive indictments against a single defendant for participation in a single conspiracy might withstand same evidence scrutiny if the court places undue emphasis upon the evidence used to prove the commission of the overt acts alleged." <u>Id.</u> at 1078.  We noted that "[i]t is the agreement which constitutes the crime, not the overt acts. . ." <u>Id.</u> (quoting <u>Young</u>, 503 F.2d at 1076).  To address this concern, we adopted the "totality of the circumstances" test, which did not emphasize overt acts.  From prior cases of this Court that had implicitly used that test, we extracted four factors to consider when determining whether there was one or more agreements: (a) the "locus criminis" of the alleged conspiracies; (b) the degree of temporal overlap between the conspiracies; (c) the overlap of personnel between the conspiracies, including unindicted co-conspirators; and (d) the similarity in the overt acts charged and role played by the

---

[2]  The same evidence test asks whether "the evidence required to support a conviction upon one of [the indictments] would have been sufficient to warrant a conviction upon the other." <u>United States v. Young</u>, 503 F.2d 1072, 1075 (3d Cir. 1974) (quoting <u>United States v. Pacelli</u>, 470 F.2d 67, 72 (2d Cir. 1972), <u>cert. denied</u>, 410 U.S. 983 (1973)).

defendant in each indictment. Id. If the defendant makes the requisite showing, he is entitled to a pretrial evidentiary hearing to adjudicate his double jeopardy claim. Id. at 1077.

In applying the Liotard totality of the circumstances analysis, we have understood that the ultimate inquiry presented by conspiracy double jeopardy claims is whether there are two agreements or only one. See Becker, 892 F.2d at 268 ("The critical determination is whether one agreement existed."); see also Ciancaglini, 858 F.2d at 927. To that end, we have not applied the Liotard factors in a rigid manner, as different conspiracies may warrant emphasizing different factors. See id. at 930 ("[I]t is neither wise nor possible to attempt an exhaustive listing of the factors that may enter into the totality of the circumstances test. . . ."). In Becker, the defendant was convicted in Pennsylvania of a conspiracy to possess with intent to distribute marijuana in Pennsylvania, New Jersey, and Massachusetts. He had a prior conviction in West Virginia for a conspiracy to manufacture and distribute marijuana, and argued that the West Virginia conviction barred the Pennsylvania conviction. In this particular conspiracy case, we found important the fact that the conspiracies had different objects. The object of the West Virginia conspiracy had been to manufacture and possess with intent to distribute. In contrast, the Pennsylvania indictment alleged that the objects were to smuggle, store, and distribute marijuana. "These were two different objectives and agreements, and hence two conspiracies."

10

Becker, 892 F.2d at 268. Although we noted that the time periods alleged in both indictments overlapped, such temporal overlap by itself did not prove one conspiracy. Id. Similarly, when we applied the totality of the circumstances test to successive RICO prosecutions in Ciancaglini, we found most important the fact that the indictments alleged different patterns of racketeering activity. See 858 F.2d at 930. One indictment alleged a pattern of illegal gambling and extortion; the other focussed on murder and drug distribution. We noted that the outcome was sensitive to a different mix of factors: "[U]nder our totality of the circumstances test, a more significant overlap of time, or a more substantial identity of overt acts or similarity in predicate acts could dictate a different result." Id.

Finally, we must keep in mind that a primary objective of our jurisprudence in this area is to assure that the substance of the matter controls and not the grand jury's characterization of it. Thus, for example, the fact that the Kentucky indictment here alleges a conspiracy to commit mail fraud while the New Jersey one alleges a conspiracy to transport in interstate commerce the proceeds of a fraud is wholly unimportant if the evidence indicates that there was but one agreement to defraud GTECH utilizing both the mails and the interstate transportation of funds. E.g., Braverman v. United States, 317 U.S. 49 (1942); United States v. Reyes, 930 F.2d 310, 312 (3d. Cir. 1991); United States v. Morrow, 717 F.2d 800, 804 (3d Cir. 1983), cert. denied, 464 U.S. 1069 (1984). We must not allow the double jeopardy

11

clause to be subverted by artful pleading or by the selective and strategic reservation of evidence in one prosecution so that it can be used in a subsequent one premised upon the same agreement.

The government has argued here that the details and scope of the criminal conspiracies as revealed by a simple reading of the New Jersey and Kentucky indictments should control our inquiry. We decline the government's invitation to look solely to the acts as alleged in each indictment. Those acts are, of course, primarily the overt acts which the grand jury chose to allege in each instance. Undue emphasis on the alleged overt acts is precisely the problem we sought to avoid when we adopted the totality of the circumstances approach. That approach requires us to look into the full scope of activities described and implied in the indictments.

In Felton, for example, we looked not only to the overt acts alleged but also to aspects of the conspiracy implied but not emphasized or even described in the indictments. The defendant Hathorn had already pled guilty in Florida to a charge of conspiracy to possess with intent to distribute marijuana when he was indicted in Pennsylvania as Felton's drug supplier. The Pennsylvania indictment simply stated that Felton purchased large quantities of marijuana from Hathorn in 1980. Prior to trial, an evidentiary hearing had been held following a successful non-frivolous showing, but the court denied his double jeopardy claim. We reversed, finding that testimony indicated that Hathorn was involved in one "continuing, albeit loosely

12

organized, conspiracy" to smuggle drugs into the country by plane and distribute them.  Felton, 753 F.2d at 279.  Hathorn and his co-conspirators had made at least four drug smuggling flights in 1980 and 1981.  The smuggling flight that was the basis of the Florida indictment was one of these flights, and at the Pennsylvania hearing, an agent of the Drug Enforcement Agency linked the marijuana sold to Felton to another of these flights. We noted that these flights were very similar, all originating in Atlanta, picking up marijuana in Columbia, and returning to similar locations.  Id. at 280.  Had we not looked beyond the acts alleged in the Pennsylvania indictment, we would not have uncovered the operational and locational similarity of the conspiracies in which Hathorn participated.  Thus, we must look to the entire record before the district court in examining the totality of the circumstances to determine if the conspiracies alleged in the two indictments truly are different agreements.

IV.

Using the Liotard factors as a framework for evaluating the totality of the circumstances, we have carefully examined Smith's double jeopardy claim.  He insists that the indictments paint a picture of a single, over-arching conspiracy in which he acted in concert with IMC, Adams, his Kentucky and New Jersey co-defendants, and others to divert funds from GTECH in Rhode Island for the benefit of himself and his wife in Kentucky.  While we agree that the two alleged conspiracies are similar in location,

13

time frame, and the roles he played, Smith has failed to provide a basis for inferring that all of the conspirators were tied together into one conspiracy. There is some overlap among the alleged conspirators, but he has shown no reason to believe that the New Jersey defendants and Kentucky defendants may have been committed to the same agreement.

"Locus criminis" is defined very simply as the "locality of a crime; the place where a crime was committed." Black's Law Dictionary 941 (6th ed. 1990). Smith argues that the primary locations for both conspiracies was in Rhode Island, where GTECH's headquarters and his office were located, and where the funds were allegedly diverted, and Kentucky, where he allegedly received the kickbacks. The government stresses that all the acts alleged in the Kentucky indictment occurred in Kentucky, and all those alleged in the New Jersey indictment occurred in New Jersey. We agree with Smith that events underlying the New Jersey and Kentucky indictments commence and end at the same spots and that the geography of his alleged criminal activity is consistent with the existence of what he describes as an over-arching conspiracy. Although the indictments focus on acts in different states, they both implicate important acts in furtherance of the alleged conspiracies in both Rhode Island and Kentucky.

With respect to the chronological component of the Liotard analysis, extensive temporal overlap is apparent from the record: the New Jersey conspiracy spanned March 1992 to March

14

1994, and the Kentucky conspiracy spanned April 1992 to February 1994.

Also, we agree with Smith that the government's evidence indicates he played a virtually identical role in the activities that the government characterizes as two conspiracies. In each instance, he used his influence as national sales manager to procure contracts or fraudulent sales for his alleged co-conspirators. He then used his relationships with his creditors and others in Kentucky to launder the kickback proceeds.

While we agree with Smith that these three factors are consistent with a single conspiracy, they are neither alone nor together dispositive in his case. Two conspiracies may be found despite similarity in location, see, e.g., United States v. Macchia, 35 F.3d 662, 671 (2d Cir. 1994); Ciancaglini, 858 F.2d at 929, and extensive overlap in time periods, see, e.g., Macchia, 35 F.3d at 669-70; United States v. Brown, 926 F.2d 779, 782 (8th Cir. 1991); Becker, 892 F.2d at 268; Ciancaglini, 858 F.2d at 930. A defendant may play a similar role in multiple, unrelated conspiracies. See, e.g., United States v. Robinson, 774 F.2d 261, 273-75 (8th Cir. 1985) (holding that organizer of two similar, contemporaneous loan scams could be tried for each loan scam conspiracy); United States v. Somers, 950 F.2d 1279, 1282 (7th Cir. 1991) (holding two, overlapping conspiracies were distinct even though defendant acted as major distributor of cocaine in each), cert. denied, 504 U.S. 917 (1992).

15

That brings us to the factor most critical in the context of Smith's case -- the extent of the overlap of personnel between the two alleged conspiracies. Smith correctly points out that he and IMC and the other designated third parties in Kentucky played a role in the activities alleged in both the Kentucky indictment and the New Jersey indictment. To this extent, there is an overlap. But Smith's argument, we believe, misses a critical point.

An overlap in membership is useful to a double jeopardy analysis to the extent that it helps determine whether the alleged conspirators in both indictments were committed to the same objectives and consequently were members of a single conspiracy. When the same people are involved in the activities which the government alleges to be undertaken in furtherance of two different conspiracies, it will normally be possible to infer that they were aware of each other, of each other's activities, and of each other's objectives. When the activities are interdependent or mutually supportive to any degree, the inference becomes compelling that the participants are involved in but one conspiracy. Even where there are participants in one alleged conspiracy who are not involved in the activities of the other alleged conspiracy, these inferences may still have persuasive force when the common participants predominate. However, in evaluating the degree of overlap-in-participants factor in a particular case, one must look to the circumstances of both the common participants and the participants apparently

16

connected with only one of the alleged conspiracies. When the evidence indicates that the activities of the alleged conspiracies are not interdependent or mutually supportive and that there are major participants in each conspiracy who lack knowledge of, or any interest in, the activities of the other, this factor weighs heavily in favor of a conclusion that two conspiracies exist.

The necessity of looking to the circumstances of all participants in the two alleged conspiracies arises from basic conspiracy law. A criminal agreement is defined by the scope of the commitment of its co-conspirators. See generally Marcus, P., Prosecution and Defense of Conspiracy Cases, §§ 4:01-4:02 (1995). Thus, where a defendant is unaware of the overall objective of an alleged conspiracy or lacks any interest in, and therefore any commitment to, that objective, he is not a member of the conspiracy. In Kotteakos v. United States, 328 U.S. 750 (1946), for example, the indictment alleged a single conspiracy to obtain loans from the FHA using fraudulent information. The evidence, however, showed that while a single individual, Brown, was at the "hub" of the scheme and assisted in the preparation of each loan application, the other individuals in each loan transaction had no interest in the success of any loan application other than their own. As described in a subsequent Supreme Court case, the evidence in Kotteakos did not show a single conspiracy:

> Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The

17

conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan.

Blumenthal v. United States, 332 U.S. 539, 558 (1947). "The jury could not possibly have found, upon [this] evidence, that there was only one conspiracy." Kotteakos, 328 U.S. at 768.

In contrast, the Supreme Court in Blumenthal found that the evidence showed a single conspiracy to market whiskey at prices above the legal ceiling price in a manner that would appear lawful. Even though some of the multiple participants in the scheme were unaware of the identity or role of other participants, all were committed to a single, common objective. As the Court explained the evidence:

All knew of and joined in the overriding scheme. All intended to aid the owner, . . . to sell the whiskey unlawfully, though the two groups of defendants differed on the proof in knowledge and belief concerning the owner's identity. All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey. True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan. He thus became a party to it . . . ."

Blumenthal, 332 U.S. at 559.

Following the law established in Kotteakos and Blumenthal, in numerous variance cases we have drawn a distinction between multiple and single conspiracies based upon the existence of a commitment to a single set of objectives. See United States v. Kenny, 462 F.2d 1205, 1216 (3d Cir.) (holding that "evidence of a large general scheme, and of aid given by

18

some conspirators to others in aid of that scheme" is sufficient to establish single conspiracy), cert. denied, 409 U.S. 914 (1972); see also Reyes, 930 F.2d at 313; United States v. Theodoropoulos, 866 F.2d 587, 593 (3d Cir. 1989); United States v. Adams, 759 F.2d 1099, 1109-10 (3d Cir.), cert. denied, 474 U.S. 906, and 474 U.S. 971 (1985).

We have found this distinction between multiple and single conspiracies no less compelling in the double jeopardy context. In Becker, we compared a conspiracy to grow and distribute marijuana with a conspiracy to smuggle and distribute foreign-grown marijuana and found decisive that "[t]hese were two different objectives" and "hence two conspiracies." 892 F.2d at 268 (emphasis added). In Liotard, we compared two conspiracies to steal different truckloads of goods from the same trucking company. The government argued that the fact that the separate heists were arranged in distinct conversations proved two conspiracies. We held, however, that the defendant had made a non-frivolous showing of a single conspiracy. We noted, inter alia, that the conspirators in each alleged conspiracy were committed to a common goal. "The . . . goal of each conspiracy was, in addition to the personal enrichment of the participants, the financial ruination of the alleged co-conspirators' employer . . . ." 817 F.2d at 1077. We rejected the government's contention because once all the conspirators had agreed to the common objective, the organization of sub-plots would not be "indicative of a separate conspiracy." Id. at 1079 n.8. As

19

succinctly stated by the court in United States v. Mintz, "[i]n a double jeopardy analysis involving conspiracies, the court must determine whether the two transactions were interdependent and whether the Defendants were 'united in a common unlawful goal or purpose.'" 16 F.3d 1101, 1104 (10th Cir.), cert. denied, 114 S. Ct. 2723, and 114 S. Ct. 2760 (1994); see also Macchia, 35 F.3d at 771–72 (examining interdependence as one factor in double jeopardy analysis); United States v. Dortch, 5 F.3d 1056, 1063–64 (7th Cir. 1993) (same), cert. denied, 114 S. Ct. 1077 (1994); United State v. Daily, 921 F.2d 994, 1007 (10th Cir. 1990) ("Of principle concern is whether the conduct of the alleged co-conspirators, however diverse and far-ranging, exhibits an interdependence."), cert. denied, 502 U.S. 952 (1991). Cf. United States v. Richerson, 833 F.2d 1147, 1154 (5th Cir. 1987) (discussing interrelatedness of several conspiracies).

The ultimate purpose of the totality of the circumstances inquiry is to determine whether two groups of conspirators alleged by the government to have entered separate agreements are actually all committed to the same set of objectives in a single conspiracy. A non-frivolous showing of a single conspiracy will be made when the record reveals a degree of participant overlap, which together with other factors, permits an inference that members of each alleged conspiracy were aware of the activities and objectives of the other conspiracy and had some interest in the accomplishment of those objectives. When, as here, a defendant claims that there was a single hub and

20

spoke conspiracy despite the presence of spoke conspirators who lacked knowledge of each other's activities, a factfinder will be unable to infer the existence of but one conspiracy in the absence of evidence that the activities of the spoke participants were, to some degree, interdependent or mutually supportive.

In the context of this case, we must look to whether Wells and his companies and D'Andrea and LaPorta and their companies were engaged in any common activities that are alleged in either or both indictments or are otherwise revealed in the record, or if their respective schemes were interdependent in any way. The answer to this inquiry is readily apparent -- there is nothing to indicate that the co-conspirators named in the Kentucky indictment and those named in the New Jersey indictment engaged in any common activities or that their respective schemes were interdependent.

The lack of common activities or interdependence is the root problem with Smith's position. He gives us no reason to believe that the New Jersey and Kentucky conspiracies were interdependent or mutually supportive in any way. He can identify nothing in the record suggesting that Wells was actually aware of D'Andrea and LaPorta, or vice versa, and he cannot point to any common activities engaged in for the benefit of all participants. The co-conspirators in each state derived no benefit, financial or otherwise, from Smith's activities in the other state, nor was the success of the conspiracy in one state contingent on the success of the conspiracy in the other. To the

contrary, what the record reveals of the economics of the kickback schemes strongly suggests that Wells had no motive to commit himself to anything beyond the receipt of his commissions and that the same is true for D'Andrea and LaPorta and their consulting fees. From the lack of mutual awareness and interdependence, economic or otherwise, we can only conclude that each group of conspirators had an interest in and were committed only to receiving their own unearned compensation.

Smith also suggests that the indictments show that he may have been involved in a hub or core conspiracy that planned the subconspiracies in each state. Such a core conspiracy conceivably could exist even where the subconspiracies are not interdependent except for the overlap in membership and common planning. Put differently, he is suggesting that there may be three conspiracies, one core conspiracy and two or more subconspiracies, and that acquittal on one subconspiracy precludes prosecution on the others. We agree that if Smith, IMC, and the other designated third parties in Kentucky conspired, they may well have been core conspirators in an interstate conspiracy headed by Smith.[3] The possibility that a core conspiracy existed, however, does not change our conclusion.

---

[3] The current record would permit a trier of fact to infer that (1) the kickbacks paid by the service providers in both Kentucky and New Jersey were intended to, and did, benefit Mrs. Smith; (2) IMC received kickbacks from the service providers in both Kentucky and New Jersey and passed them on to, or applied them for the benefit of, Mr. and Mrs. Smith; and (3) Mrs. Smith was the sole principal in IMC. Based on these inferences, we believe a trier of fact could further infer that Smith, Mrs. Smith and

22

If Smith had perceived the opportunity to defraud GTECH through the submission of fraudulent invoices from service providers, and acting alone like Brown in <u>Kotteakos</u>, had independently recruited service providers in several states to submit such invoices, arranged for the payment of the invoices by GTECH, and received kickbacks from the service providers in each state, he and the service providers in each state, like Brown and each of the loan applicants, would have been members of separate conspiracies. Under the principles discussed in <u>Kotteakos</u> and applied in subsequent decisions,[4] the service providers in each state, assuming that they lacked commitment to the success of Smith's overall, interstate scheme to defraud, would have been members of distinct conspiracies, and Smith could have been prosecuted separately for each.

---

IMC were aware of, and committed to, the success of an interstate conspiracy to defraud GTECH.

[4] <u>See</u>, <u>e.g.</u>, <u>Robinson</u>, 774 F.2d at 265, 273-75 (holding that "mastermind" behind two similar loan scams involving different sets of co-conspirators could be tried for both conspiracies); <u>United States v. Korfant</u>, 771 F.2d 660, 662 (2d Cir. 1985) (holding that company participating in two price fixing schemes with different sets of co-conspirators could be tried for both because "[t]he participation of a single common actor in what are allegedly two sets of conspiratorial activities does not establish the existence of a single conspiracy . . . . This is true even where the common actor is alleged to have directed both sets of activities") (citations omitted); <u>United States v. Papa</u>, 533 F.2d 815, 822 (2d Cir. 1976) (holding that defendant could be tried for two conspiracies with different co-conspirators because he "was the director of two <u>unrelated</u> chains distributing narcotics" and "the mere fact that he supervised each chain does not transform two separate conspiracies into one" (emphasis added)); <u>see also</u> <u>Somers</u>, 950 F.2d at 1282 (holding that cocaine distributor could be convicted of two, contemporaneous conspiracies to distribute cocaine in same locality where distributees and suppliers differed in each conspiracy).

The question posed by Smith's possible participation in a core conspiracy is whether this conclusion would be different if the evidence were to show that Smith, while independently recruiting the service providers in each state, had secured the commitment of his wife, IMC, and perhaps other core conspirators to his overall, interstate scheme to defraud. While we have found surprisingly little authority on the point, we are convinced that the answer is "no." Because a conspiracy is defined by the scope of commitment of its participants, the existence of a master, core conspiracy would not change the character of the agreements with the service providers. Each has its own distinct scope of commitment and membership. Whether or not there was a core conspiracy, we perceive no reason why Smith cannot be prosecuted both for his conspiracy with the Kentucky service provider and for his conspiracy with the New Jersey service providers. As Justice Stevens observed in <u>United States v. Broce</u>, the fact that there may be an ongoing, core conspiracy is not inconsistent with the prosecution of a member of that conspiracy for separate illegal agreements with others entered into in furtherance of the overall objective of the core conspiracy:

> [T]he continuous, cooperative effort among Kansas highway contractors to rig bids, which permeated the Kansas highway construction industry for more than 25 years . . . was unquestionably a single, continuing conspiracy that violated § 1 of the Sherman Act, 15 U.S.C. § 1. It does not necessarily follow, however, that separate bid-rigging arrangements carried out in furtherance of an illegal master plan may not be prosecuted separately.

24

. . . .

> There is something perverse in the assumption that respondents' constitutional rights may have been violated by separately prosecuting them for each of two complete and flagrant violations of the Sherman Act simply because they may also have been guilty of an ongoing and even more serious violation of the same statute for more than a quarter of a century.

488 U.S. 563, 580-81 (Stevens, J., concurring). See also Dortch, 5 F.3d at 1063 ("While it is likely that [defendants] only had one agreement with each other, that does not prevent them, as a partnership, from joining more than one conspiracy to distribute cocaine in the East St. Louis/St. Louis area. '[T]he guarantee against double jeopardy does not insulate a criminal from punishment for subsequent offenses merely because he chooses to continue committing the same type of crime.' West, 670 F.2d at 681.").[5]

As we have indicated, a non-frivolous showing of a single conspiracy under Liotard's totality of circumstances approach is not a high threshold. The defendant need only be able to identify alleged facts and other evidence which, if credited, gives reason to believe that any alleged conspiratorial activity was in furtherance of a single conspiracy. Having considered the totality of circumstances in Smith's case, we

---

[5] This case does not present the issue of whether the government, having first prosecuted a defendant for an over-arching core conspiracy, can then prosecute him for a subconspiracy with one who is not a core conspirator to accomplish one of the objectives of the core conspiracy. Arguably, this would be akin to a subsequent prosecution for a lesser included offense. Since the Kentucky prosecution here was limited to the conspiracy to defraud GTECH in the transactions involving Kentucky invoices, we, of course, express no opinion on that issue.

25

conclude that he has failed to make a non-frivolous showing because there is nothing in the record that suggests that the New Jersey defendants and Kentucky defendants are tied together into a single conspiracy by a commitment to a single set of objectives.  Our conclusion is the same whether we examine the totality of the circumstances for a single conspiracy or for a core conspiracy with multiple subconspiracies.

V.

Smith contends that under Ashe v. Swenson, 397 U.S. 436 (1970), the government is collaterally estopped from prosecuting him in New Jersey.  He argues that because the Kentucky district court found no "intent to defraud" GTECH on both the conspiracy and mail fraud counts, the government is precluded from proving any intent to defraud GTECH in New Jersey, defeating the conspiracy and substantive fraud charges set forth in the indictment there.  We are unpersuaded.

The findings of the trial judge in Kentucky were, of course, limited to the charges before him.  They were accordingly limited to the payments made by GTECH to Bluegrass and the illegal kick-back payments made by it.  The court concluded that the government had not proved that the payments were made in furtherance of a scheme to defraud GTECH.  While the government should not be permitted to attempt to contradict these factual findings in the New Jersey case, there is no reason to believe that it will attempt to do so.  Clearly, there is no conflict

26

between those findings and the facts alleged in the New Jersey indictment and, accordingly, there is no basis for not allowing the case to proceed to trial.[6]

## VI.

The April 5, 1995, order of the district court will be affirmed.

---

[6] Insofar as the conspiracy charge is concerned, the defendant's double jeopardy and collateral estoppel claims both turn on whether there is but one conspiracy. Smith recognizes this fact himself. In the section of his brief arguing for estoppel, he states that "[w]hen one considers that the Government fragmented the single alleged fraud into two separate indictments for tactical reasons, the acquittal in Kentucky was in reality an acquittal for the whole fraud, no matter how the Government divided up the charge." Appellant's Brief at 36-37. As we have indicated, we perceive no bar to the government's proceeding to attempt to prove the New Jersey conspiracy.