**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 08-3218
_____

UNITED STATES OF AMERICA,

v.

JOHN J. RIGAS;
TIMOTHY J. RIGAS,

Appellants

On Appeal from the District Court
for the Middle District of Pennsylvania
(No. 05-cr-00402-001 and 05-cr-00402-002)
District Judge: Honorable John E. Jones III

_____

Argued February 17, 2010

Before: McKEE, <u>Chief Judge</u>, SCIRICA, RENDELL,
BARRY, AMBRO, FUENTES, SMITH, FISHER,
CHAGARES, JORDAN, and HARDIMAN, <u>Circuit Judges</u>

(Opinion Filed: May 12, 2010)

Lawrence G. McMichael, Esq.  (ARGUED)
Matthew P. Faranda-Diedrich, Esq.
Patrick M. Northen, Esq.
Dilworth Paxson
1500 Market Street, Ste. 3500E
Philadelphia, PA 19102

Joseph U. Metz, Esq.
Dilworth Paxson
112 Market Street, 8th Floor
Harrisburg, PA 17101

Counsel for Appellants

Alan Hechtkopf, Esq.
Alexander P. Robbins, Esq. (ARGUED)
United States Department of Justice
Post Office Box 502
Washington, DC 20044

George J. Rocktashel, Esq.
Office of United States Attorney
240 West Third Street, Ste. 316
Williamsport, PA 17701

Counsel for Appellees

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge, with whom McKEE, Chief Judge, and BARRY, AMBRO, SMITH, FISHER, and JORDAN, Circuit Judges, join:

Defendants John and Timothy Rigas (the "Rigases") seek to prevent their federal trial in Pennsylvania for conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and for substantive tax evasion violations.[1] The Rigases, who were convicted of conspiracy under the same statute in New York, claim that their reprosecution in Pennsylvania violates their right to be free from double jeopardy. Specifically, they contend that § 371 creates a single offense that can be violated in alternative ways, and that the Government cannot split a single conspiracy into two prosecutions. The Government, on the other hand,

---

[1]  18 U.S.C. § 371 provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

3

contends that § 371 creates separate and distinct crimes, and therefore the Rigases' prosecution in Pennsylvania presents no double jeopardy violation. We conclude that, under a plain and natural reading of § 371, the statute creates a single offense, and that the successive prosecution of the Rigases in this case may constitute a double jeopardy violation.

## I. Background[2]

This appeal stems from the 2002 collapse of Adelphia Communications Corporation ("Adelphia"). John Rigas was the founder of Adelphia. Until 2002, he served as Adelphia's Chairman and Chief Executive Officer ("CEO"). His son, Timothy Rigas, was a board member and the Chief Financial Officer ("CFO"). Until its disastrous collapse in 2002, Adelphia was the sixth largest cable television provider in the United States. Although the Rigas family did not own a majority of Adelphia's outstanding common stock, they controlled a

---

[2] The following facts relate principally to the areas of overlap between the New York Indictment and Pennsylvania Indictment. They are derived from the indictments in both cases, as well as the background sections of the opinions issued by the District Courts in New York and Pennsylvania, and the Court of Appeals for the Second Circuit. See United States v. Rigas, 565 F. Supp. 2d 620 (M.D. Pa. 2008); United States v. Rigas, 490 F.3d 208 (2d Cir. 2007), cert denied, 552 U.S. 1242 (2008); United States v. Rigas, No. 02-cr-1236, 2008 WL 2544654 (S.D.N.Y. June 24, 2008).

majority of Adelphia's shareholder votes.[3] As a result, the Rigas family elected eight of Adelphia's nine directors and controlled all of Adelphia's corporate affairs.

In the late 1990s, Adelphia began a process of rapid expansion by acquiring other cable operators. It financed these acquisitions by issuing new corporate stock and taking on corporate debt. As a result of this process, Adelphia became highly leveraged. In order to avoid diluting their control of Adelphia, and to create the appearance that Adelphia was reducing its debt burden, the Rigases purchased large amounts of Adelphia stock and assumed Adelphia's debt. According to the Government, these transactions were a sham. When the true state of Adelphia's finances and operations became clear, Adelphia collapsed.

Prior to June 2002, Adelphia's stock was registered with the Securities and Exchange Commission ("SEC") and was publicly traded on the NASDAQ National Market System. In January 2002, Adelphia's stock traded at $31.85. By June 2002, Adelphia's stock was worth pennies a share and was delisted by NASDAQ.

In 2002, John and Timothy Rigas were indicted in the Southern District of New York. The New York Indictment charged, among other offenses, a wide-ranging conspiracy to loot Adelphia and to hide both the Rigases' plunder and Adelphia's weak financial condition from the public and the

---

[3]  Adelphia had two classes of common stock: Class A exercised one vote per share, while Class B exercised ten votes per share.

5

SEC, all in violation of 18 U.S.C. § 371. A jury subsequently convicted the Rigases on the conspiracy count, as well as a number of substantive fraud offenses. They were acquitted of wire fraud and one of the bank fraud counts.

In 2005, the Rigases were indicted in the Middle District of Pennsylvania and charged with conspiracy to defraud the United States in violation of 18 U.S.C. § 371 by evading the taxes due on their ill-gotten gains. John and Timothy Rigas were also each charged with three counts of tax evasion for the tax years 1998 to 2000.[4]

## A.   The New York Action

In September 2002, a grand jury sitting in the Southern District of New York returned an indictment against John Rigas, Timothy Rigas, Michael Rigas (Adelphia's Executive Vice President of Operations and another son of John Rigas), and Michael Mulcahey (an Adelphia executive but not a member of the Rigas family). See United States v. Rigas, No. S1-02-cr-1236 (S.D.N.Y.). A Superseding Indictment, returned in July 2003, charged the defendants with conspiracy to commit an

---

[4]   In 2008, after the District Court denied the Rigases' double jeopardy motion, a federal grand jury convened in Pennsylvania returned a Superseding Indictment adding additional substantive tax evasion charges related to the 2001 tax year. The Superseding Indictment also adds additional detail to the conspiracy count. Our review is based on the original Indictment before the District Court at the time it issued its decision, but we note differences between the Indictment and Superseding Indictment where relevant.

6

offense against the United States in violation of 18 U.S.C. § 371. The objects alleged by the conspiracy count were numerous: securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5; wire fraud in violation of 18 U.S.C. §§ 1343 and 1346; making false and misleading statements in SEC filings in violation of 15 U.S.C. § 78ff; falsification of the books of a public company in violation of 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff, and 17 C.F.R. § 240.13b2-1; and bank fraud in violation of 18 U.S.C. § 1344. The Rigases were also charged in twenty-two substantive counts of wire fraud, bank fraud, and securities fraud. The New York Indictment was supplemented by a Bill of Particulars on January 2, 2004.

After a four-and-a-half month trial, the jury found John and Timothy Rigas guilty of: (1) conspiracy to commit securities fraud, to make false statements to the SEC, to falsify Adelphia's books and records, and to commit bank fraud; (2) securities fraud in connection with the purchase or sale of Adelphia Class A stock, debentures, and notes; and (3) bank fraud. They were acquitted of wire fraud. The jury did not reach a conclusion about whether wire fraud was an object of the conspiracy. The Second Circuit reversed one of the two bank fraud counts, but affirmed the remaining convictions. Rigas, 490 F.3d at 236, 239.

John Rigas received a sentence of five years imprisonment on the conspiracy count, and an aggregate sentence of twelve years on all the counts. Timothy Rigas received a sentence of five years imprisonment on the conspiracy count, and a total combined sentence of seventeen years on all counts. Id. Financial penalties were governed by a

7

Settlement Agreement between the Government and the Rigas family, including John Rigas, Doris Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Ellen Rigas Venetis. The Settlement Agreement did not apply to any tax violations.

### 1. New York Conspiracy Count

Count One of the New York Indictment alleged a wide-ranging conspiracy (1) to create the false appearance that Adelphia's operating performance was strong and that Adelphia was reducing its debt burden, (2) to use Adelphia assets for the personal benefit of members of the Rigas family, and (3) to make false and misleading statements. We focus on the second aspect of the conspiracy, which most closely overlaps with the charges in the Pennsylvania Indictment.

The New York Indictment and Bill of Particulars alleged that the Rigases used Adelphia funds, "[a]mong other things[,] . . . to construct a golf course on land primarily owned by JOHN J. RIGAS; routinely used Adelphia's corporate aircraft for their personal affairs, without reimbursement to Adelphia; and used at least approximately $252,157,176 in Adelphia funds to pay margin calls against loans to the Rigas family." New York Indictment ¶ 62. According to the Bill of Particulars: Adelphia purchased real estate from Rigas family members above market value without the property being conveyed to Adelphia; Adelphia purchased real estate for Rigas family members and paid to maintain and renovate that property; Adelphia paid the Rigases' property taxes and insurance premiums; Adelphia paid golf club membership dues for the Rigases, paid expenses related to Ellen Rigas's wedding, and purchased 100 pairs of slippers for Timothy Rigas. The New York Bill of Particulars

also alleged that Adelphia made "charitable contributions" on behalf of the Rigases.

From about 1999 to 2002, "Adelphia advanced millions of dollars in cash to JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, in excess of their publicly disclosed compensation." New York Indictment ¶ 169. Other unnamed family members also received "substantial amounts of cash." Id. In about 2001, John Rigas began receiving monthly cash payments of about $1 million. In April 2001, the Rigases "caused Adelphia to file an amended annual report on Form 10-K, which falsely understated the total amount of compensation to [the Rigases and others] by failing to include the[se] cash advances." Id. According to the New York Bill of Particulars, these cash advances totaled nearly $80 million.

In June 2001, the Rigases began constructing a golf course on land in Coudersport, Pennsylvania. Adelphia owned a small portion of the land, while John Rigas owned the rest. The Rigases used approximately $13 million in Adelphia funds on golf course equipment, development, and construction.

Adelphia operated three airplanes out of an airport in Wellsville, New York. The Rigases, "and other members of the Rigas family, routinely used the Adelphia Airplanes for personal travel" without reimbursing Adelphia. Id. ¶ 192.

The Rigases also took Adelphia stock without paying for it and used Adelphia assets to pay for their purchases of Adelphia stock. The Rigas family claimed that they were reducing Adelphia's debt by purchasing substantial amounts of Adelphia stock, but they never actually paid for that stock. Instead, Adelphia "purportedly was compensated for those

9

securities by 'assumptions' by certain [Rigas Family Entities] of debt owed by Adelphia." New York Indictment ¶ 74. These "assumptions" had no financial significance because Adelphia remained "jointly and severally liable for all such debts." Id.

The Rigases also took shares of common stock owned by Adelphia from Adelphia's vault and placed them in an escrow account for the benefit of the Buffalo Sabres, a National Hockey League team owned by the Rigas family.

### 2. New York Wire Transfer Counts

The substantive counts in the New York Indictment included five wire fraud counts. They charged that Adelphia made the following fraudulent wire transfers: (1) a September 18, 2001 transfer of $5 million; (2) an October 1, 2001 transfer of $4.5 million; (3) a March 28, 2002 transfer of about $6.4 million; (4) a March 29, 2002 transfer of about $3.9 million; and (5) an April 12, 2002 transfer of about $4.3 million. The Rigases were acquitted of these charges.

### B. The Pennsylvania Action

On October 6, 2005, a grand jury sitting in the Middle District of Pennsylvania returned an indictment charging John and Timothy Rigas with (1) one count of conspiracy to defraud the United States in violation of 18 U.S.C. § 371; and (2) six counts of tax evasion in violation of 26 U.S.C. § 7201.

According to the Pennsylvania Indictment, the Rigases' conspiracy to evade income tax dates back to the late 1980s, shortly after Rigas family members sold privately held cable

companies to Adelphia.[5]  As a result of this transaction, Rigas family members paid over $12.6 million in federal income taxes. "JOHN J. RIGAS and TIMOTHY J. RIGAS stated to an Adelphia employee that they would never pay this large amount of taxes again."  Pennsylvania Indictment 6, ¶¶ 1-2.  Timothy Rigas told "Adelphia employees that the Rigas family members should not take large salaries from Adelphia, but should 'live out of the company.'" Id. at 6, ¶ 3.

Shortly thereafter, the Rigases began diverting funds from Adelphia accounts to Rigas family members and family-controlled entities.  The allegations about these diverted funds closely parallel the allegations in the New York Indictment: to make these transfers look legitimate to the public and outside auditors, Timothy Rigas accounted for many of these transfers as "loans or intercompany receivables owed to Adelphia, so as to evade the payment of income taxes on the diverted funds." Id. at 6-7, ¶ 5.  The Rigases used Adelphia's funds to purchase the Buffalo Sabres hockey team, to pay personal expenses, to build a golf course, to pay for Adelphia stock, and to pay margin loans used to buy additional Adelphia stock.  The Rigases also used Adelphia's corporate aircraft for personal travel.  Timothy Rigas occasionally made false accounting entries indicating that the Rigases had repaid these loans or assumed liability for Adelphia's corporate debt in exchange for the loans.  In all, the Pennsylvania Indictment alleges that the Rigases diverted $1.9 billion from Adelphia for the personal benefit of Rigas family

---

[5]  Unless otherwise indicated, the following facts are derived from the allegations in the original Pennsylvania Indictment.

11

members,[6] resulting in a tax loss of over $300 million. T h e substantive counts of the Indictment allege that John Rigas personally evaded approximately $51 million in income tax for the years 1998 to 2000, and that Timothy Rigas evaded $85 million in income tax for those years.

The Rigases maintain that the alleged conspiracy—to defraud the United States as charged in Pennsylvania, and to commit offenses against the United States as charged in New York—was formed by the same illegal agreement, and therefore they should have been prosecuted under both theories in the same proceeding. The District Court denied the Rigases' motion to dismiss the Pennsylvania Indictment. On appeal, a panel of this Court concluded that the Rigases established a prima facie case that there was only one conspiratorial agreement. Accordingly, the panel remanded the matter to the District Court for a hearing to determine whether the Pennsylvania prosecution should be dismissed on double jeopardy grounds. See United States v. Rigas, 584 F.3d 594 (3d Cir. 2009). We granted the Government's petition for rehearing. For the reasons that follow, we will vacate and remand to the District Court to conduct an evidentiary hearing.

## II.  Discussion

The Rigases argue that the Pennsylvania conspiracy count subjects them to double jeopardy since they were already prosecuted and convicted for conspiring to commit an offense

---

[6]  The Superseding Indictment alleges that the Rigases diverted an additional $900 million and claims a correspondingly larger tax loss.

12

against the United States in New York. They reason that because 18 U.S.C. § 371 creates a single statutory offense of conspiracy that can be violated in alternative ways, they can only be tried once for a single conspiratorial agreement in violation of that statute. The Rigases also argue that the New York jury concluded that they did not take Adelphia's funds for their personal use, and thus that the substantive tax evasion counts contained in the Pennsylvania Indictment are barred by the collateral estoppel component of double jeopardy. The District Court denied the Rigases' motion to dismiss the Pennsylvania Indictment, rejecting both of their arguments.[7]

## A. Double Jeopardy

The double jeopardy clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "Protections against double jeopardy are ancient and we interpret the Double Jeopardy Clause in light of its origin and the line of its growth." United States v. Rivera, 384 F.3d 49, 54 (3d Cir. 2004) (citations, quotation marks, & footnote omitted)

---

[7] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction to consider this appeal under 28 U.S.C. § 1291.

Our review of double jeopardy challenges is plenary. See United States v. Ciancaglini, 858 F.2d 923, 926 (3d Cir. 1988). "Since collateral estoppel as a bar to reprosecution is a component of the Double Jeopardy Clause and is an issue of law, our review is plenary." United States v. Merlino, 310 F.3d 137, 141 (3d Cir. 2002).

13

(noting origins of double jeopardy protections in Greek and Roman law). A defendant bears the initial burden of presenting evidence to put his double jeopardy claim at issue. See United States v. Felton, 753 F.2d 276, 278 (3d Cir. 1985). "If the defendant makes a non-frivolous showing of double jeopardy, he is entitled to a pre-trial evidentiary hearing to determine the merits of his claim." United States v. Liotard, 817 F.2d 1074, 1077 (3d Cir. 1987) (citing United States v. Inmon, 594 F.2d 352, 353 (3d Cir. 1979)). "Once the defendant has made out his or her prima facie case, the burden of persuasion shifts to the government to prove by a preponderance of the evidence that the two indictments charge the defendant with legally separate crimes." Id. (citing Felton, 753 F.2d at 278).

Importantly, the Double Jeopardy Clause prohibits repeat trials for the same offense, not for the same conduct. Accordingly, a defendant may be subject to multiple prosecutions for the same conduct if Congress intended to impose multiple punishments for that conduct. See Albernaz v. United States, 450 U.S. 333, 344 (1981). In other words, a defendant generally may be subject to multiple prosecutions so long as each prosecution involves a different offense.

### 1. The **Blockburger** Test

Before evaluating the merits of the Rigases' double jeopardy claims, we must determine the appropriate analytical test to apply. The Government contends that to determine whether § 371 reveals Congress' intent to separately punish the same course of conduct, we should apply the test the Supreme Court outlined in United States v. Blockburger, 284 U.S. 299, 304 (1932). The Rigases, on the other hand, argue in favor of

utilizing the broader totality-of-the-circumstances test to discern congressional intent.

In Blockburger the Supreme Court states that, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Id. (citations omitted). In other words, "[u]nder the Blockburger test, a court looks to the statutory elements of the crime charged to determine if there is any overlap." United States v. Chorin, 322 F.3d 274, 281 (3d Cir. 2003). Thus, in Albernaz the Supreme Court concluded that the Blockburger test applies where the defendant's conduct violated multiple conspiracy statutes. 450 U.S. at 339-40; see also United States v. Xavier, 2 F.3d 1281, 1290-91 (3d Cir. 1993) (applying Blockburger test where single statute was clearly divided into separate provisions with different penalty provisions).

The Blockburger test is a tool for determining whether Congress intended to separately punish violations of distinct statutory provisions, and is therefore inapplicable where a single statutory provision was violated. In other words, distinct statutory provisions are a condition precedent to applying the Blockburger test. Thus, the Supreme Court did not find Blockburger relevant in a case where a "single agreement is the prohibited conspiracy, and however diverse its objects [that agreement] violates but a single statute, § 37 of the Criminal Code," a predecessor to the current general conspiracy statute. Braverman v. United States, 317 U.S. 49, 54 (1942); see also Sanabria v. United States, 437 U.S. 54, 70 n.24 (1978) (holding that the Blockburger test did not apply to violation of a single

15

statute); United States v. Evans, 854 F.2d 56, 58 (5th Cir. 1988) (concluding that the "Blockburger test is not applied to find separate offenses where the act or transaction violates but a single statutory provision").

Nevertheless, the Government argues that our precedent in Xavier mandates application of the Blockburger test to § 371. (See Appellee's Br. for Rehearing 13.) In Xavier, the defendant was convicted of possession of a firearm and possession of a firearm during a violent crime in violation of Virgin Islands' law.[8] 2 F.3d. at 1290. The defendant challenged the district court's sentence, arguing that imposition of consecutive sentences on both counts placed him in double jeopardy. Id. In evaluating his claim, we first looked to the statutory scheme to discern whether the Virgin Islands' legislature intended multiple punishments for convictions under the statute. We then applied

---

[8]   At the time Xavier was decided, V.I. Code Ann. Tit. 14, § 2253(a) provided:

> Whoever, unless otherwise authorized by law, has, possesses, bears, transports or carries either openly or concealed on or about his person, or under his control in any vehicle [ ] any description of firearm . . . shall be sentenced to imprisonment of not less than six months nor more than three years and shall be fined not more than $5,000, except that . . . if such firearm or an imitation thereof was had, possessed, borne, transported or carried by or under the proximate control of such person during the commission or attempted commission of a crime of violence . . . then such person shall be sentenced to imprisonment of not less than five years nor more than ten years and shall be fined not more than $10,000.

2 F.3d at 1291.

the Blockburger test to determine whether the inference that the Virgin Islands' legislature "intended multiple punishments [was] a reasonable one." Id. at 1291 (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 981 (2d Cir. 1990)). Finally, we reviewed the statute's legislative history. Using all three interpretative tools, we determined that consecutive sentences for possession of a firearm and possession of a firearm during a crime of violence did place the defendant in double jeopardy, and therefore vacated the defendant's sentence and remanded the case to the district court for re-sentencing.

Xavier, however, does not stand for the proposition that Blockburger is the test used to evaluate whether a statute creates single or multiple offenses, the issue presented in this case. Rather, Xavier merely held that where it may be inferred that a legislature intended multiple punishments for offenses charged under separate statutes or in different parts of a statute, Blockburger may be utilized to confirm that inference. Id. Indeed, in Xavier, the government conceded that the two crimes were the same offense under a Blockburger analysis because possession of a firearm was a lesser included offense of possession of a firearm during a violent crime. Id. Thus, Xavier does not inform or govern our analysis here, where the sole issue is whether § 371 creates a single offense that may be violated in alternative ways or distinct offenses that may be prosecuted successively without running afoul of double jeopardy.

Simply put, utilizing Blockburger to discern congressional intent as to whether § 371 creates a single crime or distinct crimes puts the cart before the horse. Before determining whether application of the Blockburger test is appropriate, we must determine whether § 371 creates a single offense.

Both the New York and Pennsylvania actions allege violations of 18 U.S.C. § 371, which contains two prongs. The heart of the Rigases' challenge is that 18 U.S.C. § 371 creates a

17

single offense that may be committed in two ways, i.e., either by "conspiring to commit an offense against the United States," as charged in the Southern District of New York Indictment, or by "conspiring to defraud the United States," as charged in the Middle District of Pennsylvania Indictment. Thus, "[i]n order to sustain a conviction under § 371, the government must show: (1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy." United States v. Harmas, 974 F.2d 1262, 1267 (11th Cir. 1992).[9]

The Rigases therefore argue that double jeopardy bars the Middle District of Pennsylvania's successive prosecution because it is based on a violation of the same statute they were

_____

[9] The specific elements of conspiracy to defraud the United States are: (1) an agreement to defraud the United States; (2) the defendants intentionally joining the agreement; (3) one of the conspirators committing an overt act; and (4) an overt act in furtherance of the conspiracy. See United States v. McKee, 506 F.3d 225, 238 (3d Cir. 2007). The specific elements of conspiracy to violate federal law are: (1) an agreement to commit an offense proscribed by federal law; (2) the defendants intentionally joining in the agreement; (3) one of the conspirators committing an overt act; and (4) an overt act in furtherance of the conspiracy. See O'Malley, et al., Federal Jury Practice and Instructions, Pattern Criminal Jury Instructions, Instruction 62 (1988). The District Court found that each prong of § 371 contained a separate element, and thus, that the Blockburger test was satisfied.

At argument, the Rigases conceded that if we were to apply the Blockburger test, we would affirm the District Court's decision because the "offense" and "defraud" clauses each contain an element that the other does not contain.

18

convicted of violating in the New York prosecution, and because application of the totality-of-the-circumstances test, outlined in Liotard, 817 F.2d at 1078, reveals that the conspiracies charged in both jurisdictions are the same. Cf. Sanabria, 437 U.S. at 70 n.24 (rejecting application of the Blockburger test when the defendant was accused of a "single violation of a single statute"). Accordingly, the Rigases fault the Government for not bringing both conspiracy charges in the same indictment.

The Government argues, on the other hand, that the totality-of-the-circumstances test is reserved for situations in which a defendant is charged with successive violations of the same conspiracy statute, and that here the Rigases are charged with committing two distinct offenses prohibited by § 371. In other words, the Government maintains that § 371 creates separate, distinct crimes. In turn, the Government rejects application of the totality-of-the-circumstances test, arguing that Blockburger's elements test demonstrates that the successive prosecutions do not violate the Rigases' Fifth Amendment right because Congress may authorize cumulative punishments for separate criminal offenses that occur in the same act. See Albernaz, 450 U.S. at 344; United States v. Kimbrew, 406 F.3d 1149, 1151-52 (9th Cir. 2005) (applying Blockburger test to separate criminal conspiracy counts). Accordingly, a single conspiratorial agreement can be prosecuted twice if it violates two separate conspiracy statutes. Braverman, 317 U.S. at 54; Albernaz, 450 U.S. at 344.

In United States v. Alston, 77 F.3d 713, 718 (3d Cir. 1996), we noted that "[§] 371 refers to two types of conspiracies." We have also previously described an agreement to defraud the United States and to commit a substantive offense as "a single conspiracy with two objects." United States v. Schramm, 75 F.3d 156, 158 (3d Cir. 1996) (discussing charge of conspiracy to defraud the United States and to commit mail

19

fraud). We have not yet, however, explicitly addressed whether these types of conspiracy are parts of a single statutory offense. Thus, we must determine whether the New York and Pennsylvania prosecutions are based on a violation of the same statutory provision. We conclude that they are.

"Whether a particular course of conduct involves one or more distinct 'offenses' under the statute depends on congressional choice." Sanabria, 437 U.S. at 70. We discern congressional intent by first analyzing the statutory text, and we "interpret a statute by giving it its most natural reading." United States v. Easter, 553 F.3d 519, 525 (7th Cir. 2009) (citing United States v. Ressam, 553 U.S. 272, 274 (2008)).[10] As previously noted, § 371 provides that:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

Thus, § 371 contains three key components. First, "two or more persons conspire." Second, the object of the conspiracy must be "either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner

---

[10] We reiterate that Blockburger is a tool of statutory construction that is utilized to determine whether prosecution under two distinct statutory provisions violates double jeopardy, but does not control "where . . . there is a clear indication of contrary legislative intent." Albernaz, 450 U.S. at 340. Plain language analysis, on the other hand, is the appropriate tool of statutory construction that is utilized to determine whether Congress created distinct statutory provisions.

or for any purpose." Third, "one or more of such persons [must] do any act to effect the object of the conspiracy."

Although the second provision contains a number of alternatives, this does not suggest that § 371 creates more than one offense. "'A statute often makes punishable the doing of one thing or another, . . . sometimes thus specifying a considerable number of things. Then, by proper and ordinary construction, a person who in one transaction does all, violates the statute but once, and incurs only one penalty.'" Griffin v. United States, 502 U.S. 46, 51 (1991) (ellipsis in original) (quoting 1 J. Bishop, New Criminal Procedure § 436, at 355-56 (2d ed.1913)); see also Schad v. Arizona, 501 U.S. 624, 636 (1991) (noting that "legislatures frequently enumerate alternative means of committing a crime without intending to define separate elements or separate crimes"); Milanovich v. United States, 365 U.S. 551, 553-54 (1961) (holding that a defendant cannot be separately convicted under both prongs of 18 U.S.C. § 641, which prohibits embezzling or stealing from the United States or receiving such stolen property); United States v. Yeaman, 194 F.3d 442, 453 (3d Cir. 1999) (holding that a statute criminalizing a "device, scheme or artifice to defraud, an obtaining of money or property by material misrepresentation, or a transaction that operates as a fraud or deceit on a purchaser" creates single offense (internal quotation marks omitted)); United States v. Navarro, 145 F.3d 580, 589-90 (3d Cir. 1998) (holding that federal money laundering statute creates a single offense that can be committed in three alternate ways).

We believe that, under a plain and natural reading of its text, § 371 creates one offense, not two distinct offenses. First, Congress' use of the word "either" before "to commit any offense" and "to defraud" demonstrates that these objects provide alternative means of committing a single type of offense rather than creating separate offenses. Indeed, Merriam-

21

Webster defines "either" as: "the one or the other of the two." Webster's Third New International Dictionary 728 (3d ed. 1993). The dictionary also notes that "either" is "used as a function word before . . . or to indicate that what immediately follows is the first of two or more alternatives that are equally applicable." Id. Next, in cases "[w]hen the term 'or' is used, it is presumed to be used in the disjunctive sense unless the legislative intent is clearly contrary." United States v. Driscoll, 761 F.2d 589, 597 (10th Cir. 1985). Importantly, "in penal statutes, the word 'or' is seldom used other than as a disjunctive." Id. at 598 (citing 21 Am. Jur.2d, Criminal Law, § 540). Merriam-Webster defines "either-or" as "an unavoidable choice or exclusive division between only two alternatives." Webster's Third New International Dictionary 728 (3d ed. 1993). Finally, these alternatives come in the middle of the sentence, and are followed by the description of an additional element, i.e., the overt act requirement, signaling that objects are alternative means of violating § 371. Thus, the plain and literal meaning of the words "either . . . or" suggests that Congress enacted § 371 intending to create a single, criminal offense that may be committed in two alternative ways.

By endorsing this interpretation of the phrase "either . . . or," we join several other circuits which have also concluded that Congress' use of disjunctive language creates alternative ways of violating a statute. For example, relying on the "either . . . or" construction of § 371, the Eleventh Circuit reached the same conclusion in Harmas, noting that because the conspiracy statute is "written in the disjunctive [it] should be interpreted as establishing two alternative means of committing a violation." 974 F.2d at 1266;[11] see also Foutz v. United States, 72 F.3d 802,

---

[11] We also note that there is nothing in § 371's sparse legislative history, see Smith, 891 F.2d at 712, suggesting that Congress had a contrary intent, see Scrimgeour, 636 F.2d at 1023-24 (noting that a statute's words should be given their

805 (10th Cir. 1995) (noting that as a general rule the use of a disjunctive in a statute indicates that alternatives were intended); United States v. Garcia, 718 F.2d 1528, 1532-33 (11th Cir. 1983) (same); United States v. Scrimgeour, 636 F.2d 1019, 1024 (5th Cir. 1981) (same).

Thus, we conclude that the most natural reading of the statute is that Congress created a single offense that may be committed in alternative ways. The Government argues, however, that such an interpretation is overly formalistic, and contends that Congress may—and indeed does—regularly combine distinct, multiple, and sometimes incongruent offenses within a single statute. Thus, the Government posits that the statute is similar to, and should be read as if, it contains a § 371(a), i.e., the "offense" clause, and a § 371(b), i.e., the "defraud" clause, evidencing Congress' clear intent to create distinct offenses. This argument, however, is unpersuasive and only undermines the Government's position.

When Congress crafts a statute to create distinct offenses, it typically utilizes multiple subsections or separates clauses with semicolons to enumerate the separate crimes. See, e.g., Jones v. United States, 526 U.S. 227, 252 (1999) (interpreting the three subsections of 18 U.S.C. § 2119, the federal carjacking statute, as creating three distinct crimes); see also 18 U.S.C. § 922(a)-(p) (defining separate firearm offenses). Here, unlike most statutes that create multiple offenses, § 371 is a single sentence, divided only by commas. The fact that Congress declined to structure § 371 in such a manner undermines the interpretation advanced by the Government and supports our single-offense rendering of the statute.

---

plain meaning and that "there is 'ordinarily' no need to resort to legislative history" unless "a clear contrary legislative intention is shown").

Furthermore, what § 371 criminalizes is the unlawful agreement and not the substantive offenses which may be the object of the conspiracy. See Iannelli v. United States, 420 U.S. 770, 777 (1975) (noting that the "essence" of a conspiracy "is an agreement to commit an unlawful act"); United States v. Dansker, 537 F.2d 40, 51 (3d Cir. 1976) ("[T]he crime of conspiracy is [a] separate and distinct [offense] from the related substantive offense."). "Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes." Braverman, 317 U.S. at 53. Indeed, the "basic rationale of the law of conspiracy is that a conspiracy may be an evil in itself, independently of any other evil it seeks to accomplish." Dennis v. United States, 341 U.S. 494, 573 (1951) (Jackson, J., concurring). "This settled principle derives from the reason [that] . . . collective criminal agreement . . . presents a greater potential threat to the public than individual delicts. . . . [T]he danger of a conspiratorial group [is not] limited to the particular end toward which it has embarked. . . . [T]he danger which a conspiracy generates is not confined to the substantive offense which is the immediate aim of the enterprise." Callanan v. United States, 364 U.S. 587, 593-94 (1961). For this reason, "[i]t is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues." Salinas v. United States, 522 U.S. 52, 65 (1997). Therefore, however diverse the objects of a § 371 conspiracy may be, the emphasis remains on—and the statute is aimed at—criminalizing the illegal agreement.[12]

---

[12] Albernaz does not compel a different conclusion. In Albernaz, the Supreme Court focused, in part, on the objects of the conspiracies—the fact that importation and distribution of marijuana impose diverse societal harm—to reach its conclusion that convictions under 21 U.S.C. §§ 846 and 963 could result in consecutive sentences. 450 U.S. at 343. Here, unlike in

24

In holding that § 371 creates a single offense, we join the majority of circuits that have reached the same conclusion when faced with challenges to indictments based on duplicity. "Duplicity is the improper joining of distinct and separate offenses in a single count. Duplicitous counts may conceal the specific charges, prevent the jury from deciding guilt or innocence with respect to a particular offense, exploit the risk of prejudicial evidentiary rulings, or endanger fair sentencing." United States v. Haddy, 134 F.3d 542, 548 (3d Cir. 1998) (internal citations omitted). An impermissibly duplicitous indictment is subject to dismissal.

In United States v. Smith, the defendants claimed that the indictment against them was infirm and must be dismissed because it charged two separate offenses—conspiracy to commit an offense against the United States and conspiracy to defraud the United States in violation of 18 U.S.C. § 371—in the same count. 891 F.2d 703, 705 (9th Cir. 1989). The Ninth Circuit disagreed, reasoning that the "two clauses [of § 371] should be interpreted to establish alternate means of commission, not separate offenses." Id. at 712. The Ninth Circuit further noted that:

Albernaz, we are analyzing a single statute and not separate statutes which clearly create two distinct crimes. See 21 U.S.C. § 846 (criminalizing conspiracies to violate the subchapter on control and enforcement) and 21 U.S.C. § 963 (criminalizing conspiracies to violate the subchapter addressing the import and export of narcotics). Furthermore, the Supreme Court rested its holding primarily on the statutes' language, focusing on the objects of the conspiracies as a way to glean congressional intent only to confirm its plain language analysis. Albernaz, 450 U.S. at 343. As we have stated, the plain language here clearly demonstrates that Congress intended to create one crime with multiple means of commission.

25

It would be strange to infer that Congress intended to punish twice a conspiracy that violates both clauses. Where a single criminal statute prohibits alternative acts, courts should not infer the legislature's intent to impose multiple punishment.

Id. at 712-13 (9th Cir. 1989) (citing See Prince v. United States, 352 U.S. 322, 329 (1957)). Consequently, the Ninth Circuit refused to dismiss the indictment on duplicity grounds because "the defendants were charged with a conspiracy under separate clauses of the same statute, not two separate statutes." Id. at 712.

The Second, Ninth, Eleventh and District of Columbia Circuits have reached the same conclusion and held that single counts alleging violations of both the "offense" and "defraud" prong of § 371 are not duplicitous. In other words, because these counts charge one crime, not two, it logically follows that § 371 creates a single offense. See, e.g., United States v. Manton, 107 F.2d 834, 839 (2d Cir. 1939) (Sutherland, J.) (holding that indictment was not "bad for duplicity because it alleges that the conspiracy contemplated the violation of a criminal statute and also the defrauding of the United States")[13]; United States v. Williams, 705 F.2d 603, 623-24 (2d Cir. 1983) (indictment alleging offense and defraud conspiracy in same count not duplicitous); United States v. Wiley, 979 F.2d 365, 367-68 (5th Cir. 1992) (same); United States v. Pierce, 479 F.3d 546, 552 (8th Cir. 2007) ("Each of the three sets of object offenses—fraudulent tax returns, mail fraud and wire

---

[13] Both Manton and Blockburger were authored by Justice Sutherland, who sat by designation in Manton. We note that Manton, which was written some years later, did not apply the Blockburger test to resolve whether the predecessor to the modern-day conspiracy statute created one or more offenses.

26

fraud—further the general agreement and are multiple facets of one conspiracy."); United States v. Smith, 424 F.3d 992, 1000 (9th Cir. 2005) (analyzing charges under different prongs as single offense "[b]ecause all three conspiracy counts in this case violate the same statute"); Smith, 891 F.2d at 712-13 (holding that single indictment count charging both provisions of § 371 was not duplicitous), amended as to form of opinion only, 906 F.2d 385 (9th Cir. 1990); United States v. Hauck, 980 F.2d 611, 615 (10th Cir. 1992) (holding that single conspiracy count to defraud government agency and to commit other substantive offenses was not duplicitous because "it is permissible to charge a single offense but specify alternative means to commit the offense"); Harmas, 974 F.2d at 1266; May v. United States, 175 F.2d 994, 1002-03 (D.C. Cir. 1949) (rejecting argument that "a conspiracy to violate a criminal statute and to defraud the United States was two offenses"); but see United States v. Haga, 821 F.2d 1036, 1043 (5th Cir. 1987) ("Count I must have charged a conspiracy either to 'commit any offense' or to 'defraud the United States'; it cannot have charged both."); United States v. Ervasti, 201 F.3d 1029, 1039 (8th Cir. 2000) ("Though it is not divided formally into subsections, § 371 plainly establishes two offenses."); United States v. Thompson, 814 F.2d 1472, 1475-77 (10th Cir. 1987) (applying the Blockburger test to conclude that the defendant had not presented a discernable double jeopardy claim even though the first prosecution charged conspiracy to commit mail fraud under "offense" prong of § 371 and the second charged conspiracy to impede lawful function of United States under "defraud" prong of § 371).[14] The majority of these cases support our conclusion that the plain language of § 371 creates a single crime.

The Government urges us to disregard cases holding that § 371 creates a single offense for duplicity purposes, contending

_____

[14] The Fifth, Eighth and Tenth Circuits have inconsistent precedent.

27

that those cases are irrelevant because duplicity is a mere pleading requirement.[15] We reject this argument for two reasons. First, it is simply untenable, as urged by the Government, that Congress intended the plain language of the statute to have one meaning in the duplicity context and an entirely different meaning for double jeopardy purposes. Even assuming that duplicity and double jeopardy concerns are aimed at different purposes, the distinct aims of the analyses do not alter the fact that the text we are interpreting is the same. Statutory text is not so malleable.

Second, the Government too readily dismisses duplicity as a mere pleading requirement, detached from double jeopardy concerns. To the contrary, the issue in both duplicity and double

_____

[15] We note that on numerous instances the United States Attorneys' Offices in the Third Circuit, including the United States Attorney's Office for the Middle District of Pennsylvania, have charged both provisions of § 371—to commit an offense and/or to defraud the United States—as a single offense. See, e.g., United States v. Donahue, 885 F.2d 45, 46 (3d Cir. 1989) (Middle District of Pennsylvania charged conspiracy to defraud and to avoid filing currency transaction reports); United States v. Alston, 77 F.3d 713, 714 (3d Cir. 1996) (Eastern District of Pennsylvania charged conspiracy to defraud and to commit financial structuring); United States v. Schramm, 75 F.3d 156, 158 (3d Cir. 1996) (Western District of Pennsylvania charged conspiracy to defraud and to commit mail fraud); United States v. Kemmel, 160 F. Supp. 718, 720 (M.D. Pa. 1958) (holding that indictment charging single count of conspiracy to defraud the United States and to commit an offense against the United States was not duplicitous because "[t]he conspiracy is the crime, and that is one, however diverse its objects" (citation & quotation marks omitted)).

jeopardy is whether Congress intended to create one offense or two. See, e.g., United States v. Conley, 37 F.3d 970, 980 (3d Cir. 1994) ("In conducting a double jeopardy analysis, the goal is to ascertain legislative intent and to apply the statute at issue, as written, in keeping with that intent."); 1A Charles Alan Wright, Federal Practice and Procedure § 142, at 17-20 (3d ed. 1999) (noting that "the real question [in analyzing an indictment for duplicity] is one of legislative intent, to be ascertained from all the data available"); cf. Milanovich v. United States, 365 U.S. 551, 553-54 (1961) (noting that issue of whether statute was designed to create two punishments for the same criminal act is one of statutory interpretation). Indeed, duplicity does have constitutional dimensions, undermining the Government's suggestion that it is a mere pleading requirement. See United States v. Aguilar, 756 F.2d 1418, 1420 n.2 (9th Cir. 1985) ("The vices of duplicity arise from breaches of the defendant's Sixth Amendment right to knowledge of the charges against him, since conviction on a duplicitous count could be obtained without a unanimous verdict as to each of the offenses contained in the count. A duplicitous indictment also could eviscerate the defendant's Fifth Amendment protection against double jeopardy, because of a lack of clarity concerning the offense for which he is charged or convicted.") (internal citations omitted). Further, "[o]ne vice of duplicity is that a general verdict . . . could prejudice the defendant in protecting himself against double jeopardy." United States v. Sparks, 515 F.2d 112, 116 (3d Cir. 1975). Consequently, there is simply no principled basis for distinguishing the cases that held that § 371 creates a single offense for duplicity purposes from the case at bar.

## 2. Totality of the Circumstances

29

Given our determination that the plain language of 18 U.S.C. § 371 reveals Congress' intent to create a single criminal offense that may be violated in two alternative ways, the Blockburger test is not the appropriate interpretive tool to ascertain whether the successive Pennsylvania prosecution places the Rigases in double jeopardy since the same-elements test is applicable only to distinct statutory provisions. Rather, we apply the totality-of-the-circumstances test to determine whether the Government impermissibly split a single conspiracy into multiple conspiracies, thereby violating the Rigases' Fifth Amendment rights. Accordingly, we must consider whether the Rigases' conduct violated the statute multiple times or only once.

The Double Jeopardy Clause prohibits the government from "splitting one conspiracy into several prosecutions." United States v. Becker, 892 F.2d 265, 268 (3d Cir. 1989) (citation omitted). Additionally, a single conspiracy should not be divided into multiple prosecutions, each alleging different overt acts. See Liotard, 817 F.2d at 1078. In the conspiracy context:

> It is the agreement which constitutes the crime, not the overt acts. . . . Proper weight must be given to consideration of whether the overt acts alleged in the first conspiracy charge were carried out in furtherance of the broad agreement alleged in the second indictment or whether these acts were carried out in furtherance of a different agreement.

Id. (quoting United States v. Young, 503 F.2d 1072, 1076 (3d Cir. 1974)). In such a case, "[t]he danger is that successive indictments against a single defendant for participation in a single conspiracy might withstand same evidence scrutiny [under the Blockburger test] if the court places undue emphasis upon the evidence used to prove the commission of the overt

30

acts alleged." Id.; cf. Krulewitch v. United States, 336 U.S. 440, 447 (1949) (Jackson, J., concurring) (noting that "chameleon-like, [conspiracy] takes on a special coloration from each of the many independent offenses on which it may be overlaid").

To resolve this problem, the majority of the Courts of Appeals, including the Third Circuit, have developed a totality-of-the-circumstances test to distinguish conspiracy prosecutions. See, e.g., Becker, 892 F.2d at 268. This test directs a district court to look at the totality of the circumstances involved in each offense. The ultimate goal of the totality-of-the-circumstances test is to determine "whether there are two agreements or only one." United States v. Smith, 82 F.3d 1261, 1267 (3d Cir. 1996); see also Becker, 892 F.2d at 268 ("The critical determination is whether one agreement existed.").

Factors that prove helpful in determining whether an indictment charges one or more conspiracies are: "(1) 'whether there was a common goal among the conspirators'; (2) 'whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators'; and (3) 'the extent to which the participants overlap in the various dealings.'" United States v. Kemp, 500 F.3d 257, 287 (3d Cir. 2007) (quoting United States v. Kelly, 892 F.2d 255, 259 (3d Cir. 1989)).

We also consider whether:

> (a) the [location] of the two alleged conspiracies is the same; (b) there is a significant degree of temporal overlap between the two conspiracies charged; (c) there is an overlap of personnel between the two conspiracies (including unindicted as well as indicted coconspirators); and (d) the overt acts charged and [(e)] the role

31

> played by the defendant according to the two indictments are similar.

Liotard, 817 F.2d at 1078 (internal citations omitted). In other words, the defendant must show that the place, time, people, actions, and responsibilities are similar in both prosecutions. This list, however, is not exhaustive, and "different conspiracies may warrant emphasizing different factors." Smith, 82 F.3d at 1267. Further, when examining the totality of the circumstances, a district court must "assure that the substance of the matter controls and not the grand jury's characterization of it." Id. Thus, a court must "look into the full scope of activities described and implied in the indictments." Id. at 1268.

In Liotard, the defendant had been acquitted of a § 371 conspiracy to violate 18 U.S.C. § 2314 by transporting stolen goods in interstate commerce. 817 F.2d at 1076. He was subsequently charged with a § 371 conspiracy to violate 18 U.S.C. § 659 by stealing from an interstate shipment of goods. Id. The District Court declined to conduct a hearing on the defendant's double jeopardy claim. Id.; see also United States v. Liotard, 638 F. Supp. 1101, 1104 (D.N.J. 1986).

We applied the totality-of-the-circumstances test and concluded that the defendant had made out a nonfrivolous showing of double jeopardy because merchandise was stolen from the same place, the period of the conspiracy charged in the first indictment was entirely subsumed within the period of time set out in the second indictment, the principal coconspirator was the same in both indictments, the nature of the overt acts charged in the two indictments were nearly identical, and the defendant played the same role in each charged indictment. Liotard, 817 F.2d at 1078-79. We found that it was immaterial that the two indictments alleged different acts of theft. Id. at 1079. We similarly found that it was insignificant that the two indictments alleged conspiracy to commit different underlying offenses. Id. at 1078 n.7 (holding that "these differences in

statutory violation are immaterial and fortuitous"). Thus, we concluded that Liotard was entitled to a pretrial evidentiary hearing. Id. at 1079.

Against this background, we turn to the Rigases' claim that the totality of the circumstances reveals that the Government impermissibly split a single conspiracy into multiple prosecutions, violating the Rigases' Fifth Amendment right to be free from double jeopardy. While, as we explain below, we are inclined to agree with the Rigases' assertion, we will remand the case to the District Court to conduct a full evidentiary hearing in accordance with this opinion.

### i. Common Goal Among the Conspirators

We first conclude that the Rigases had a common goal – namely, to enrich themselves through the looting of Adelphia. As we have stated, the Government alleged in the Pennsylvania Indictment that, after a particularly high tax bill, the Rigases decided "that they would never pay [a] large amount of taxes again." Pennsylvania Indictment 6, ¶¶ 1-2. To accomplish this purpose, the Rigases decided that "Rigas family members should not take large salaries from Adelphia, but should 'live out of the company.'" Id. To avoid detection, the Rigases engaged in sham transactions to conceal their use of corporate assets. Of course, to conceal their income from the Government, the Rigases also had to conceal it from the public in general, including shareholders. The New York Indictment simply targeted this aspect of the Rigases' scheme. Further, it is not dispositive that the conspiracy charged in the New York Indictment was broader than that charged in Pennsylvania. The charges in both indictments relate to a common goal of enriching the Rigases through the plunder of Adelphia. A "master conspiracy [can involve] more than one subsidiary scheme." United States v. Kenny, 462 F.2d 1205, 1216 (3d Cir. 1972). The allegations related to conversion of Adelphia funds

33

by the Rigases—a subsidiary scheme within the New York Indictment appear to be the same in both indictments.

The Government urges us to focus on the objectives of the conspiracies charged in the two indictments, arguing that the object of the New York conspiracy was to commit securities fraud, bank fraud, and wire fraud; to file false reports with the SEC; and to falsify the books and records of Adelphia, while the object of the Pennsylvania conspiracy was to defraud the IRS. This argument, however, misses the point of the totality-of-the-circumstances test.   It is well established that a single conspiratorial agreement can envisage the violation of several statutes.  See, e.g., Braverman, 317 U.S. at 53.  Further, the Government's approach would give undue weight to the "grand jury's characterization" of the Rigases' conduct, instead of focusing on the "substance of the matter."  Smith, 82 F.3d at 1267.   Thus, in considering whether the defendants had a common goal, we look to the underlying purpose of the alleged criminal activity.  See, e.g., United States v. Greenidge, 495 F.3d 85, 93 (3d Cir. 2007) (describing common goal as "to make money by depositing stolen and altered corporate checks into business accounts"); Kelly, 892 F.2d at 259 (describing common goal as "to make money selling 'speed'").

## ii. Continuous Result Requiring Continuous Cooperation

We next conclude that "the [Rigases'] agreement contemplated bringing to pass a continuous result that [would] not [have] continue[d] without the continuous cooperation of the conspirators." Kemp, 500 F.3d at 287 (internal quotation marks & citation omitted).  The first part of this factor overlaps with the time factor set forth in Liotard.  In evaluating the "cooperation" part of this factor, "we look to whether there was evidence that the activities of one group were necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." Greenidge, 495 F.3d at 93 (internal quotation marks, ellipsis, & citation omitted).  In

34

other words, we consider whether all aspects of the scheme were interdependent. Cf. Kemp, 500 F.3d at 289 ("[I]nterdependence serves as evidence of an agreement; that is, it helps establish whether the alleged coconspirators are all committed to the same set of objectives in a single conspiracy." (internal citation & quotation marks omitted)).

As to time, the Pennsylvania Indictment covers a wider time span than the New York Indictment, but the key years in both conspiracies are the same. The Pennsylvania Indictment alleges that the conspiracy lasted from "November 1989, through the date of the indictment [2005]," but only describes overt acts occurring between 1998 and 2002.[16] Pennsylvania Indictment 2. The majority of the allegations in the conspiracy count relate to the period between 1996 and 2002. The alleged tax loss is further limited to the period of 1998 to 2000.[17]

The New York Indictment charged a conspiracy between 1999 and May 2002. The New York Indictment, however, suggests that the Rigases' conspiratorial conduct began well before 1999. The Bill of Particulars further alleges that the Rigases began using Adelphia funds for their personal benefit "[f]rom at least . . . 1993." Bill of Particulars ¶ 81. Because the New York Indictment does not purport to reach the origin of the Rigases' conspiracy, we do not find it significant that its charges began later than those in the Pennsylvania Indictment.

As to interdependence, we reiterate that the Government claims that the Rigases appropriated money from Adelphia to avoid taking salaries on which they would have had to pay

---

[16] The Pennsylvania Superseding Indictment expands the period of the conspiracy to include 1989 to 2008, but does not allege any continuing conspiratorial activity after 2002.

[17] The Pennsylvania Superseding Indictment expands the alleged tax loss to include the 2001 tax year.

35

income tax. See Pennsylvania Indictment 6, ¶¶ 1-2 ("JOHN J. RIGAS and TIMOTHY J. RIGAS stated to an Adelphia employee that they would never pay this large amount of taxes again"; Timothy Rigas told "Adelphia employees that the Rigas family members should not take large salaries from Adelphia, but should 'live out of the company.'") Further, the Rigases had to hide their misuse of Adelphia's corporate assets from the public in order to avoid detection of their income by the Government.

### iii.  Overlapping Participants

It is also clear that there is overlap between the participants of the conspiracies charged in New York and in Pennsylvania.  The Rigases were the main actors in both indictments. Other members of the Rigas family are also central to both indictments.

The New York Indictment named a number of co-conspirators, including Michael Rigas, Michael Mulcahey, James R. Brown, and Timothy A. Werth.[18]  Although other Rigas family members were not specifically named in the New York Indictment, many of the allegations relate to "the Rigas family," including John Rigas's "wife, sons, daughter and son-in-law." New York Indictment ¶ 2. For example, the New York

---

[18]  Mulcahey was responsible for managing Adelphia's treasury, including "the supervision of money flowing into and out of Adelphia."  New York Indictment ¶ 5.  Brown was responsible for raising capital for Adelphia through securities transactions and bank loans. Werth was the Director of External Reporting for Adelphia. He was responsible for supervising the preparation of Adelphia's financial statements.

The New York Bill of Particulars named an additional seventeen unindicted co-conspirators, and described three additional possible co-conspirators under ongoing investigation.

Indictment alleges that "Adelphia advanced substantial amounts of cash to other members of the Rigas Family," id. ¶ 169, and that the Rigases caused Adelphia to file a Form 10-K "which falsely understated the total amount of compensation to . . . another member of the Rigas Family by failing to include the[se] cash advances," id. ¶ 173. The Bill of Particulars also listed at least nine members of the Rigas family who used the Adelphia corporate aircraft for personal travel. Similarly, the Pennsylvania Indictment alleges that the Rigases conspired with others known and unknown. It also alleges that the Rigases caused Michael Rigas, James Rigas, and Ellen Rigas to under-report their income.

### iv. Place

The locations of the crimes outlined in the two indictments also weigh in favor of concluding that the conspiracies alleged in the New York and Pennsylvania Indictments are the same.

The New York Indictment is geographically broader than the Pennsylvania Indictment, but both conspiracies occurred nationwide, and both Indictments focus on the Rigases' homes and Adelphia's corporate headquarters in Pennsylvania.

The Pennsylvania Indictment specifically names Coudersport, Pennsylvania; Buffalo, New York; Beaver Creek, Colorado; and New York, New York as places where acts related to the conspiracy took place. The New York Indictment also involves these locations. While the New York Indictment does not specifically identify Buffalo or Beaver Creek, the Bill of Particulars does include allegations related to those locations.

We do not find it significant that the New York Indictment also included misrepresentations to investors across the nation. The allegations related to conversion of Adelphia funds by the Rigases—a subsidiary scheme within the New

York Indictment—appear to be the same in both indictments, and thus occurred in the same locations.

### v.  Overt Acts

We similarly conclude that the overt acts alleged in both indictments are sufficiently similar to support the Rigases' assertion that the charged conspiracies are the same. Both indictments seem to allege conversion of the same assets, by the same means, in the same transactions. Certainly, each indictment alleges acts not contained in the other. The New York Indictment, which alleges both fraudulent misrepresentations about Adelphia's finances and performance, and fraudulent concealment of the fact that the Rigases were misusing corporate assets for personal purposes, is far broader than the Pennsylvania Indictment. Further, the Pennsylvania Indictment includes allegations related to filing income tax returns, which are not included in the New York Indictment. The same acts, including transactions in which the Rigases secretly took Adelphia's corporate assets, are, however, key to both indictments.

### vi.  Role Played by the Defendants

Finally, because the Rigases were central figures in both conspiracies, this factor also weighs in favor of a finding that there was a single conspiracy. The Rigases caused the wrongful transactions and were personally responsible for hiding those transactions. Putting all of these factors together, under the totality of the circumstances, the Rigases have made out a non-frivolous showing of double jeopardy. The New York Indictment alleges that the Rigases took Adelphia's corporate assets for their personal use and hid those transactions from investors and regulators. The Pennsylvania Indictment alleges that one reason the Rigases took those same assets was to avoid publicly receiving large salaries so that they could evade paying taxes.

38

In sum, because both indictments concern the same underlying transactions, they relate to the same time and place, and involve the same core group of participants. Both indictments have a common goal, and individual overt acts in both indictments were interdependent. Indeed, the record reveals no factor that would have prevented the Government from bringing the counts charged in the Pennsylvania Indictment in the New York prosecution. Accordingly, the Rigases have established a strong inference that there was a single agreement. On remand, the Government will bear the burden of proving by a preponderance of the evidence that the Rigases entered into two separate agreements.

## B.  Collateral Estoppel

The Rigases also argue that the substantive counts of tax evasion should be dismissed based on collateral estoppel. The Rigases maintain that, in acquitting them of the substantive counts of wire fraud, the New York jury must have found that any assets the Rigases obtained from Adelphia constituted legitimate loans, rather than income. "The Double Jeopardy Clause . . . embodies principles of collateral estoppel that can bar the relitigation of an issue actually decided in a defendant's favor by a valid and final judgment." United States v. Merlino, 310 F.3d 137, 141 (3d Cir. 2002) (citing Ashe v. Swenson, 397 U.S. 436, 443 (1970)). The doctrine of collateral estoppel ensures that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Ashe, 397 U.S. at 443.

The Rigases seem to argue that collateral estoppel bars the Government from relitigating the issue of whether they misappropriated any of Adelphia's assets. The New York jury, however, only returned a final judgment of acquittal as to five individual transactions set forth in Counts 17-21 of the New York Indictment: (1) a September 18, 2001 transfer of $5

39

million; (2) an October 1, 2001 transfer of $4.5 million; (3) a March 28, 2002 transfer of about $6.4 million; (4) a March 29, 2002 transfer of about $3.9 million; and (5) an April 12, 2002 transfer of about $4.3 million.[19] Accordingly, even if we found that collateral estoppel applied, it would only preclude the Government from claiming that the Rigases avoided paying taxes on the $24 million involved in those particular transactions.

In a criminal case, a defendant seeking to invoke collateral estoppel bears the burden of demonstrating that the issue he seeks to foreclose was actually decided in the first proceeding. See Dowling v. United States, 493 U.S. 342, 350-51 (1990). This is a heavy burden. See United States v. Console, 13 F.3d 641, 665 n.28 (3d Cir. 1993) ("'When a case involves a general verdict, establishing that the verdict necessarily determined any particular issue is extremely difficult.'" (quoting United States v. Bailin, 977 F.2d 270, 282 (7th Cir. 1992))). "[S]ince it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant." United States v. McGowan, 58 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks & citation omitted). Further, "[t]o claim the benefit of collateral estoppel [a defendant] must prove that the [first] jury unanimously acquitted him." Merlino, 310 F.3d at 141.

However, "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic

---

[19] These transactions relate to "margin loans" the Rigases borrowed from third parties to buy Adelphia stock on behalf of their family and correspond to payments the Rigases caused Adelphia to make on those loans. These transactions are also described as overt acts in the Pennsylvania Indictment.

approach of a 19th century pleading book, but with realism and rationality." Ashe, 397 U.S. at 444. Thus, the government cannot avoid the preclusive effect of a general jury verdict by speculating that the verdict could have been based upon a finding that the government failed to prove elements that were never contested by the defense. Id. Ashe arose out of a multi-victim armed robbery occurring at a poker game in the basement of a home. Id. at 437. During his first trial, Ashe was charged with robbing one of the participants. The only defense offered at trial was that Ashe was not present at the robbery. After Ashe was acquitted, the government sought to try the defendant a second time for allegedly robbing a different player at the same game. Id. at 439. The Supreme Court held that the jury's verdict in the first trial necessarily established that the defendant was not one of the robbers and, therefore, precluded the government from relitigating that issue. Id. at 445-46 (holding that "[t]he single rationally conceivable issue before the jury was whether the [defendant] had been one of the robbers").

To determine whether collateral estoppel bars retrial following a general verdict of acquittal, a court must examine the record of the prior proceeding and ask "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." Id. at 444. "The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." Id. (internal quotation marks & citation omitted). Nonetheless, the Rigases fall far short of meeting their burden of establishing that they are entitled to collateral estoppel.

The Rigases maintain that the issue in the New York prosecution was whether the assets they received from Adelphia were income or legitimate loans. To succeed on their collateral estoppel claim, the Rigases would have to convince us that the only question at issue in the New York trial was whether the

41

Rigases received the wire transfers as income.[20]  In other words, the Rigases would have to show that their only defense was that they believed that the wire transfers were legitimate loans. However, the record is barely sufficient to establish that this was a defense at all.

The record includes an excerpt from the New York trial in which defense counsel argued to the judge that proving the transfers were legitimate loans was a valid defense.  In this excerpt, the Government argued that the question of whether the transfers were loans or compensation was irrelevant because the real issue was whether the transfers were appropriately disclosed.

The parties also submitted excerpts of the Government's closing argument.  The Government argued that the transfers were not loans, but also argued that the transfers were not appropriately disclosed.  The parties did not submit the Rigases' closing argument, nor did they submit the New York jury instructions.  Consequently, it is impossible to determine with any certainty what defenses were raised at the New York trial.  But the record does suggest that there were other contested issues.  Accordingly, the Rigases have failed to meet their burden of demonstrating that the New York trial definitively decided that the wire transfers were not compensation.  Thus, we will affirm the District Court's denial of the Rigases' motion to dismiss the tax evasion charges in the Pennsylvania Indictment.

---

[20]  Under 18 U.S.C. § 1343, a defendant is guilty of wire fraud if he has devised a scheme to obtain money or property by means of fraud and transmitted any communication by wire in interstate commerce for the purpose of executing the scheme.

### III. Conclusion

For the reasons stated above, we will remand to the District Court to conduct an evidentiary hearing into the totality of the circumstances surrounding the conspiracies alleged in the New York and Pennsylvania Indictments to determine whether the conspiracy charged in Pennsylvania was part of the conspiratorial agreement charged in New York. We will affirm, however, the District Court's denial of the Rigases' motion on collateral estoppel grounds.

RENDELL, Circuit Judge, with whom SCIRICA, CHAGARES and HARDIMAN, Circuit Judges, join - dissenting.

The majority concludes that 18 U.S.C. § 371, read plainly and naturally, creates one offense, because the use of the words "either" and "or" demonstrates that "these objects provide alternative means of committing a single type of offense rather than creating separate offenses." Maj. Op. Section II.A.1 ¶ 13. I suggest that the plain, natural reading is that § 371 creates separate offenses.

First, the statutory phrases typically used to set forth "alternative ways" of committing one crime are quite unlike § 371. Characteristically, they are a string of "alternative routes to a conviction" purposely included lest some conduct that is intended to be criminalized is omitted. *United States v. Navarro*, 145 F.3d 580, 586 (3d Cir. 1998). In *Milanovich v. United States*, the Supreme Court held that an individual cannot be convicted and cumulatively sentenced for both stealing property and receiving the same stolen property under 18 U.S.C. § 641 because, in adding the "receiving" clause to the statute, "Congress was trying to reach a new group of wrongdoers, not to multiply the offense of the robbers themselves." 365 U.S. 551, 554 (1961) (internal quotation marks omitted). In *Navarro*, we held that the three mental states in a statute (intent to promote, knowing concealment, and knowing avoidance) did not create three separate offenses, but were three alternative ways to commit the same offense. 145 F.3d at 585. In *United States v. Yeaman*, we held that engaging in a scheme to defraud, obtaining money by a material misrepresentation, and conducting a transaction that operates as a fraud on a purchaser are alternate means of committing a single offense, not separate

offenses. 194 F.3d 442, 453-54 (3d Cir. 1999). We noted that the statute at issue in *Yeaman* did not cover "many different kinds of behavior of varying degrees of seriousness." *Id.* at 454 (internal quotation marks omitted). In *United States v. Oliver*, the Court of Appeals for the Seventh Circuit found that, for purposes of a statute criminalizing the receipt of "any firearm or ammunition," firearms and ammunition are interchangeable and the receipt of both at the same time cannot create two separate offenses. 683 F.2d 224, 232-33 (7th Cir. 1982). In each of these instances, the alternative language sets forth similar conduct integrally related so as to encompass all possible modes of commission of the same crime. The two phrases of § 371 at issue here do not fit this pattern; they do not encompass similar, related conduct but set forth distinct offenses as defined by the Supreme Court.

The Supreme Court has recognized on several occasions since this statute was first conceived[1] that the "offense" and

---

[1] Section 5440 of the Revised Statutes of the United States, codified in 1874 and corrected in 1878, is almost identical to the current statute, § 371. Section 5440 reads:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not less than one thousand dollars and not more than ten thousand dollars, and to

2

"defraud" provisions set forth very different crimes. In *United States v. Hirsch*, the Supreme Court described the predecessor statute to 18 U.S.C. § 371 as including "every form of conspiracy against the United States, *and* every form of conspiracy to defraud them." 100 U.S. 33, 35 (1879) (emphasis added). The Court further defined these conspiracies as "crimes," "which are punishable under [the statute]." *Id.* The *Hirsch* Court stated, "[t]he conspiracy here described [in the statute] is a conspiracy to commit any offence against the United States. The fraud mentioned is any fraud against them. It may be against the coin, or consist in cheating the government of its land or other property. The offence may be treason . . . ." *Id.* The very different nature of the two offenses demonstrates that they are clearly not mere "alternative routes" to a single conviction.

When discussing the defraud clause, the Supreme Court has said:

> To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest.

---

imprisonment not more than two years. Subsections and semicolons were not used in the Revised Statutes. The fact that Congress did not rewrite section 5440 to include subsections does not reflect on its original intent.

3

. . . .

It is true that words 'to defraud' as used in some statutes have been given a wide meaning, wider than their ordinary scope. They usually signify the deprivation of something of value by trick, deceit, chicane, or overreaching. They do not extend to theft by violence. They refer rather to wronging one in his property rights by dishonest methods or schemes. One would not class robbery or burglary among frauds.

*Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).

The Supreme Court has explained that the statutory language in the "*specific* [defraud] clause of § 371 . . . reaches any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Dennis v. United States*, 384 U.S. 855, 860-61 (1966) (emphasis added). In contrast, to establish a conspiracy to commit an offense against the United States, the government need not prove that the United States or an agency was the intended victim of the conspiracy, but only that there was a conspiracy to violate a United States law. *United States v. Falcone*, 960 F.2d 988, 990 (11th Cir. 1992) (en banc). The substantive offense in the offense clause need not be criminal but must be "prohibited in the interest of the public policy of the United States" and punishable "by suit for penalty." *United States v. Hutto*, 256

4

U.S. 524, 528-29 (1921).[2]   The contrast between these two
crimes is radically different from the contrast in conduct in
statutes found to contain "alternatives."   Indeed, in the latter,
there is no contrast at all, as the phraseology connotes similarity
and all-inclusiveness, not dissimilarity and distinctiveness.

Second, the fact that the use of the disjunctive generally
sets forth alternatives does not really dictate that the two
provisions of § 371 do not set forth separate crimes.  The two
provisions at issue effectively say if you conspire to do A, or, if
you conspire to do B, you will be punished.  The real issue is
whether Congress intended to punish only once under § 371 for
an agreement to do A and B, or did it intend that even if you
were tried, convicted, and punished for conspiring to do A, you
could also be tried, convicted, and punished later for conspiring

---

[2]   In *Haas v. Henkel*, the defendants were charged with
conspiring to defraud the United States (obtaining secret
government information) and conspiring to commit an offense
against the United States (using bribery to obtain the
information).  216 U.S. 462 (1910). The *Haas* Court found that
the indictment properly charged a conspiracy to defraud the
United States because "such a conspiracy [need not]
contemplate a financial loss," but need only have as its purpose
"impairing, obstructing, or defeating the lawful function of any
department of government."  *Id*. at 479.  The Court also found
that the indictment properly charged a conspiracy to commit an
offense against the United States because it is a crime to bribe
any government official "to do any act in violation of his lawful
duty."  *Id*. at 480.

5

to do B?  I suggest that Congress intended the latter, but, in any event, the "either . . . or" language does not dictate the former.

The majority's reliance on cases in which courts engaged in a duplicity analysis ignores the fact that a count does not necessarily violate principles against duplicity just because it contains allegations that could have been stated as separate offenses.  "[A] single count of an indictment should not be found impermissibly duplicitous whenever it contains several allegations that could have been stated as separate offenses, but only when the failure to do so risks unfairness to the defendant." *United States v. Root*, 585 F.3d 145, 155 (3d Cir. 2009).  A finding that charging violations of the offense and defraud clauses in one count is not impermissibly duplicitous does not then, mean, a fortiori, that they are not separate offenses. Accordingly, courts have held that a single indictment count charging violations of the "offense" and "defraud" clauses - if framed with adequate specificity - would enable determination of the "convicted" offenses and thus would not be impermissibly duplicitous.[3]

_____

[3] *See United States v. Williams*, 705 F.2d 603, 624 (2d Cir. 1983) (finding that one count alleging a conspiracy to defraud the United States and to commit various substantive offenses was not duplicitous because the conspiracy allegations were specific); *United States v. Wiley*, 979 F.2d 365, 367-68 (5th Cir. 1992) (finding that one count charging a conspiracy to defraud the United States and to commit an offense against the United States was not duplicitous because it cited "the two underlying statutes which [the defendant] is charged with conspiring to

6

The double jeopardy inquiry, by contrast, focuses on whether a later prosecution entails the double punishment prohibited by the Constitution. The overriding issue is not whether a specific indictment count speaks with the requisite lucidity, enabling precise determination of the jury's findings, but rather whether Congress intended to impose multiple punishments for violation of distinct statutory provisions. And, here, considering the obvious difference between the two types of conspiracies alleged and their implications for purposes of sentence, surely it did. These fundamentally distinct inquiries preclude rote application of duplicity precedents to the double jeopardy context.

While the majority employs various modes of analysis to support reading the statute as it does - drawing on cases involving duplicity and canons of construction - I come back to the essential question as to congressional intent and believe it unimaginable that Congress did not intend to punish separately the two distinct types of conspiracies set forth in § 371 - as have two of the three courts of appeals to have considered this issue.[4]

_____

violate and list[ed] ten overt acts in furtherance of the conspiracy").

[4] The Court of Appeals for the Eighth Circuit found with little discussion (in the context of double jeopardy, not duplicity) that § 371 "plainly establishes two offenses." *United States v. Ervasti*, 201 F.3d 1029, 1039 (8th Cir. 2000). In *United States v. Thompson*, the Court of Appeals for the Tenth Circuit also found that double jeopardy does not bar prosecutions for

7

Why would Congress separate out the defraud clause if it was not intended to mean something different?[5]

Congressional intent to impose separate punishments is "reinforced" where the two conspiracy provisions address separate evils. *Albernaz v. United States*, 450 U.S. 333, 343 (1981). Clearly, these provisions do. The "defraud" clause focuses narrowly on conspiracies targeting the federal government. *See United States v. Brandon*, 17 F.3d 409, 422 (1st Cir. 1994); *Falcone*, 960 F.2d at 990 (11th Cir. 1992); *United States v. Thompson*, 814 F.2d 1472, 1476-77 (10th Cir. 1987). The "offense" clause aims to protect the public generally. *Brandon*, 17 F.3d at 422. Accordingly, its applicability does not hinge on the identity of the target, which need not be the federal government. *Id.* Nor does the "offense" clause require proof of interference with government operations.

---

conspiracy to commit mail fraud and conspiracy to defraud the United States under § 371. 814 F.2d 1472, 1476-77 (10th Cir. 1987). *But see United States v. Smith (David L.)*, 424 F.3d 992, 1000 (9th Cir. 2005) (declining to apply *Blockburger* to assess double jeopardy because all of the conspiracy counts at issue alleged a violation of the same statute, § 371).

[5] Congress also separated out the defraud clause for statute of limitations purposes. Congress created a specific six-year statute of limitations "for offenses involving the defrauding or attempting to defraud the United States or any agency thereof, whether by conspiracy or not." 26 U.S.C. § 6531.

Rather, it broadly embraces conspiracies aimed at violating any federal law. *Id.*; *Hirsch*, 100 U.S. at 35-36. Clearly, prohibiting agreements to interfere with governmental agencies and prohibiting agreements to violate United States laws address "diverse societal harms." *Albernaz,* 450 U.S. at 343. They are directed at different evils. The majority casts this indicator aside and also dismisses the applicability of the classic double jeopardy test set forth in *Blockberger v. United States*, which also reinforces congressional intent regarding separate punishments. 284 U.S. 299 (1932).[6]

Examining this apparent intent, as well as the relevant Supreme Court jurisprudence regarding this statute, and the "evils" and "elements" tests for double jeopardy under *Albernaz* and *Blockberger*, respectively, I can only conclude that the

---

[6] *Blockberger* is "employed to ascertain whether the inference that [the legislature] intended multiple punishments is a reasonable one. If the *Blockberger* test is satisfied, it may be presumed that multiple punishments are authorized." *United States v. Xavier*, 2 F.3d 1281, 1291 (3d Cir. 1993) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 981 (2d Cir. 1990)). It is undisputed that the *Blockberger* test supports the inference that Congress intended the provisions in § 371 to create separate offenses because each requires proof of an element which the other does not. Maj. Op. n. 9. The District Court opinion by Judge Jones conducts a thorough analysis of the "offense" and "defraud" provisions under *Blockberger* and *Albernaz*. *United States v. Rigas*, 565 F.Supp. 2d 620 (M.D. Pa. 2008). I need not repeat it here.

9

"defraud" and "offense" provisions are not different ways of committing the same crime, but, instead, set forth different crimes. Accordingly, resort to *United States v. Liotard* is not necessary. 817 F.2d 1074 (3d Cir. 1987). There simply is no issue of double jeopardy.

I would accordingly affirm the District Court's order and permit the prosecution for conspiracy to commit tax evasion to proceed.